103 N.J. Super. 542 (1968)
248 A.2d 249
NORTH JERSEY DISTRICT WATER SUPPLY COMMISSION, A PUBLIC AGENCY, PLAINTIFF,
v.
CITY OF NEWARK, TOWN OF BLOOMFIELD, TOWN OF NUTLEY, TOWN OF KEARNY, BOROUGH OF WEST CALDWELL, CITY OF ELIZABETH, TOWNSHIP OF CEDAR GROVE, BOROUGH OF GLEN RIDGE, VILLAGE OF SOUTH ORANGE, BOROUGH OF VERONA AND CITY OF BAYONNE, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided January 26, 1968.
*543 Mr. Oscar R. Wilensky for plaintiff.
Mr. Norman N. Schiff for defendant City of Newark.
Mr. Joseph D. Lintott for defendant Town of Bloomfield.
Mr. Robert J. Citrino, Jr. for defendant Town of Nutley.
Mr. Robert J. McCurrie for defendant Town of Kearny.
Mr. John J. McDonough for defendant Borough of West Caldwell.
Mr. Edward W. McGrath for defendant City of Elizabeth.
Mr. Joseph A. De Stefano for defendant Township of Cedar Grove.
Mr. George H. Callahan for defendant Borough of Glen Ridge.
Mr. Donal C. Fox for defendant Village of South Orange.
Mr. Emil E. Mascia for defendant Borough of Verona.
Mr. James P. Dugan for defendant City of Bayonne.
*544 MOUNTAIN, J.S.C.
This dispute arises from the efforts, extending over at least the last decade, that have been put forth by the State of New Jersey, the North Jersey District Water Supply Commission, a large number of municipalities and other interested persons and public bodies to make available an additional water supply to certain areas of the State and particularly the heavily populated and industrialized northeastern section. The plan that was evolved, in very broad outline, contemplated that the State would acquire and make available a new supply of water, to be transmitted and delivered to interested municipalities by means of facilities assembled, constructed and operated by the North Jersey District Water Supply Commission. An important legislative step was taken by the enactment of the New Jersey Water Supply Law, 1958, N.J.S.A. 58:22-1 et seq., which made provision for the acquisition and construction of a reservoir of approximately 55 billion gallons capacity in Round Valley and a smaller reservoir of 10 billion gallons capacity on Spruce Run. Both locations are in Hunterdon County; the contemplated source of the water to fill the reservoirs is the Raritan River. Four years later the Water Transmission Facilities Act, L. 1962, c, 167, and an amendment thereto, L. 1962, c. 184, now N.J.S.A. 58:5-31 et seq., gave to the North Jersey District Water Supply Commission the authority, and placed upon it the responsibility, to assemble, acquire, operate and maintain transmission facilities adequate to carry this new water supply to those municipalities in the northern part of the State that wished to and could take advantage of it.
A contract, dated as of July 13, 1965, was prepared by the Commission and submitted to a number of municipalities. It sets forth the terms upon which the Commission will agree to deliver water, the amount which each "contracting municipality" agrees to receive (designated as its "proprietary allotment"), refers to the manner in which the cost of the water is to be determined, and provides for the handling *545 and resolution of various foreseeable eventualities. An important article of the contract reads:
"The Agreement shall be in full force and effect and be legally binding upon the Commission and upon all of the Contracting Municipalities which shall then have executed the same upon its execution and delivery by the Commission and by municipalities named as parties in the title thereto having Proprietary Allotments aggregating at least 50 million gallons (herein called the `Effective Date') and the Commission shall forthwith proceed with the Project."
Not until September 12, 1966, when the City of Bayonne became a contracting party, was this minimum requirement reached. Bayonne was the eleventh municipality to become a contracting party, and by its adherence the proprietary allotments came to total 60.925 million gallons daily. The contracting municipalities are Bayonne, Bloomfield, Cedar Grove, Elizabeth, Glen Ridge, Kearny, Newark, Nutley, South Orange, Verona and West Caldwell. Newark became party to the agreement on October 1, 1965. On April 6, 1966 it executed a document entitled "Cooperation Agreement Between City of Newark  North Jersey District Water Supply Commission  Contracting Municipalities," the purpose of which was to make available to certain of the contracting municipalities the utilization of its transmission or distribution system and its pumping facilities and to provide, where appropriate, for the "exchange" of water from its Wanaque supply for water from the Raritan River to be received under the new arrangement. A number of municipalities became parties to this cooperation agreement.
Following the effective date of the contract and pursuant to its terms the Commission entered into agreements with engineering consultants and made preliminary financing arrangements. In February 1967 Newark took action by resolution and ordinance to rescind the cooperation agreement as well as the underlying agreement that presumably had become effective September 12, 1966. The reason for this rather precipitate and apparently unheralded action has not been *546 made entirely clear to the court, but presumably it was provoked by some belated feeling of dissatisfaction with the terms of the arrangement. Be that as it may, upon learning of what had taken place in Newark, the Commission promptly commenced this action by complaint and order to show cause, joining all contracting municipalities as parties defendant but really seeking relief only against Newark. The relief sought is a declaratory judgment to the effect that the principal contract became binding and effective in respect of all parties thereto, including Newark, on September 12, 1966; that the cooperation agreement likewise took effect in accordance with its terms; that the acts of Newark purporting to rescind these arrangements be deemed null and void, and finally, that the city be restrained from "taking any further action to impair the validity of the aforementioned agreements."
The order to show cause was made returnable March 14, 1967. However, all parties to the suit, as well as the State of New Jersey, apparently being anxious to effect a settlement, the court very willingly acceded to requests for adjournment and the matter was not actually brought on for oral argument until December 15, 1967. At that time all municipalities that were represented supported plaintiff's position. The State of New Jersey appeared, and although making no application for formal intervention, recounted the efforts that had been made to bring about a settlement  efforts with respect to which it had been a principal participant; emphasized the importance of the project in its relation to the serious water shortage that has existed in recent years, and expressed the hope and desire that the proposal would go forward without delay.
The case is now before the court on complaint, order to show cause, affidavits, counter-affidavits and briefs. Additionally, Newark has filed an answer denying certain allegations set forth in the complaint and including, as separate defenses, claims that the matters in issue have been settled and *547 that the underlying contract is void and unenforceable. The denials in the answer raise no issue of merit not covered by the two separate defenses.
As to the alleged settlement, it is true that ever since this action was started in February 1967, vigorous efforts appear to have been made to resolve the dispute amicably. As indicated above, the State itself, acting through the Department of Conservation and Economic Development, extended its good offices in the general public interest and, among other things, agreed to underwrite to the extent of $250,000 an economic feasibility study of the whole project. By some time in December of last year it was generally felt that a definitive settlement had been reached. At the last minute, however, when the "settlement agreement" was being reduced to writing, obstacles arose that have resisted resolution. It is clear that no contract modifying or superseding the earlier compact has ever come into being in the sense that such later "agreement" can be given binding force. Not only has there been no complete meeting of the minds but there has been no formal action undertaken by any of the parties involved such as would be necessary under the circumstances. No municipality has adopted any appropriate resolution or ordinance, nor has the Commission itself taken any formal action such as would be necessary to constitute a legally effective act of the sort here suggested.
It is further urged that the contract of September 12, 1966 is void and unenforceable for vagueness and uncertainty and that certain of plaintiff's statements or representations have misled the city. The city, in its brief, contends that the court is being asked to decree specific performance of the contract and that such relief will not be forthcoming in respect of a contract the terms of which are uncertain in any significant respect. Such indeed is the law. It is also true that on oral argument the court itself suggested that the relief sought might be tantamount to specific performance. A careful examination of the pleadings, however, makes clear *548 that plaintiff does not seek this form of relief but rather a declaration that the contract is valid. This position is repeated in its reply brief. The court will limit its adjudication to the issue presented.
The city contends that the provisions of the agreement setting forth the manner in which the cost of water to each municipality is to be determined are so vague as to be unenforceable. The contract gives the Commission the power to fix rates for all water to be supplied, but such rate-making power may not be exercised capriciously. According to the contract, the rates must be adequate to meet all operating expenses, to pay the cost of certain additions, alterations and replacements, and to cover debt service on bonds or other obligations of the Commission. The rates must also be sufficient to provide for the creation of such reserves or sinking funds as may be required by the terms of any bondholders' agreement. They may not be fixed initially or subsequently revised except after a hearing at which all contracting municipalities may be heard. The Commission is required to prepare an annual budget of projected operating expenses for each year, and to hold a hearing where objections to the budget may be offered by the municipalities.
The terms of the contract in large part follow and reflect the provisions of the enabling legislation which, in turn, indicate quite clearly that the rates are in general to be limited in amount to what may be needed to make the enterprise self-sustaining. Thus, N.J.S.A. 58:5-37 provides that payments to be made to the Commission by the municipalities shall be sufficient "to meet the cost of purchase of water, operating and maintenance expenses and debt service including any payments into reserve or other funds for the security of bondholders and to meet or discharge other obligations to bondholders." Also, the Commission must annually prepare a budget of its projected expenses for the ensuing year which shall "be apportioned among participants in proportion to the amounts of water contracted to be used by each."
*549 Further,
"At the end of each year the commission shall apportion the actual cost of the operation of such system which it operates pursuant to the original act among participants upon the basis of the actual water consumed by each municipality, but such amount shall be in no event less than the quantity contracted for. In apportioning such cost, no municipality shall be charged with any item of interest or rental upon, or the cost of operation of, any part of a water supply system which is not used in supplying water to the municipality. Each participant and contracting municipality shall be charged with the amount so apportioned and credited with any amount previously paid on account of the estimated operating expenses for such year." N.J.S.A. 58:5-40.
It is, of course, clear that the North Jersey District Water Supply Commission is not a private corporation seeking to make a profit. It is a public body, politic and corporate, exercising public and essential government functions in the interest of the public health and welfare. N.J.S.A. 58:5-35. In very general terms, its function is to assist municipalities located within the district to secure and maintain adequate supplies of potable water. N.J.S.A. 58:5-1 et seq. The court must assume that rates to be fixed by the Commission will take account of the criteria set forth in the contract which themselves so carefully follow the statutory requirements.
Furthermore, it must be borne in mind that the contract was entered into by Newark freely and advisedly. It had full opportunity to make its own studies and surveys of probable cost, if it saw fit. It is now suggested that the cost may be greater than was first anticipated or than was projected by the Commission. Even if this be so, it is no warrant or justification for the action taken by the city. An estimate is not a guaranty. If any of the contracting municipalities saw fit to rely upon estimates presented by the Commission, they may not now be heard to complain if, because of lapse of time or otherwise, some revision seems probable. As a practical matter, it would not seem possible to make any precise determination of cost of water at a particular delivery *550 point until the transmission and distribution systems with their related facilities have been substantially completed. This is a fact of which the Legislature has elsewhere taken cognizance. N.J.S.A. 58:5-12 provides that where the Commission is authorized in general to enter into contracts with municipalities for a water supply (as distinguished from the special authorization appearing in the Water Transmission Facilities Act) the contract may be based entirely upon estimates as to probable cost. So, also, in Nelson v. Town of Kearny, 4 N.J. Misc. 157 (Sup. Ct. 1926), in interpreting a similar contract for a water supply between the North Jersey District Water Supply Commission and the Town of Kearny, the court recognized that the size and difficulty of the project and the likelihood that unforeseen contingencies might arise dictated a need for contractual terms to some extent flexible. It characterized these provisions as supplying "necessary elasticity" (at p. 161).
A situation very similar to the one before this court was presented in the case of Middlesex County Sewerage Authority v. Borough of Middlesex, 74 N.J. Super 591 (Law Div. 1962), affirmed 79 N.J. Super. 24 (App. Div. 1963). There the Sewerage Authority (which, like the Commission in this case, was a public corporation) undertook to construct and operate a regional sewage disposal system. It also entered into contracts with various eligible municipalities and, as is here the case, complaint was made that rates were excessive and contrary to initial estimates. The court pointed out that an estimate is not intended to import accuracy but can be taken only as a rough calculation; that where both parties to a contract have, or can acquire, the same information as to relevant subject matter, one party will not be heard to attack the contract by alleging reliance on representations made by the other. 74 N.J. Super., at pp. 605-606. The court examined a line of New Jersey decisions holding that municipal contracts stand on the same footing as contracts between natural persons, and that courts will not inquire *551 into the reasonableness of the terms of such contracts in the absence of bad faith, fraud or capricious action. It was observed that
"If the municipalities, or their agents, had the power to make them [the contracts under review] then the question whether it was wise to do so and whether their terms were advantageous was solely for their consideration and resolution, * * *.
In essence, the disputing municipalities contend that a bad or hard bargain was struck. Even were this so, this court, under its limited equitable jurisdiction, cannot relieve from hard bargains simply because alleged as such. It is not the function of a court to make a better contract for the parties than they have made for themselves. There could be no virtue or stability in the statutory right conferred upon municipalities to contract for the service of an authority if, after such agreement is made and during the period covered thereby, its terms may be altered." (Id., at p. 609)
In summary, the court holds that there has been no agreement, whether by way of novation or otherwise, in any way altering the terms of the contract that took effect September 12, 1966; that the contract is neither vague nor uncertain but entirely clear, valid and enforceable, nor does any estimate or prophecy of the plaintiff afford the city a legal right to complain. Finally, it is determined that the acts of the City of Newark in the form of a resolution and an ordinance seeking to rescind the contract are null and void and will be set aside.
As set forth above, the complaint asked that Newark be restrained from taking any further action to impair the validity of the agreements. I do not think that at this time, and upon the facts before the court, any restraint of this sort should issue. The prayer is couched in the most general terms, and at least in the present posture of the case, a restraint in equally general terms would not be appropriate. Accordingly, the judgment to be entered will be confined to adjudicating the matters with respect to which a declaratory judgment has been sought.