272 N.J. Super. 238 (1994)
639 A.2d 745
PASSAIC COUNTY UTILITIES AUTHORITY, PLAINTIFF-RESPONDENT,
v.
DIBELLA SANITATION SERVICE, INC., DEFENDANT-APPELLANT. PASSAIC COUNTY UTILITIES AUTHORITY, PLAINTIFF RESPONDENT,
v.
ANCHOR CARTING CORP., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 2, 1994.
Decided April 12, 1994.
*239 Before Judges GAULKIN, R.S. COHEN and WALLACE.
John A. Gonnella argued the cause for appellant DiBella Sanitation Service, Inc.
Ronald S. Bergamini argued the cause for appellant Anchor Carting Corp. (Riccardelli & Rosa, attorneys; Marla J. Moss, on the joint brief submitted on behalf of appellants).
Sheldon L. Cohen argued the cause for respondent Passaic County Utilities Authority (DeCotiis & Pinto, attorneys; Mr. Cohen and Andrew Bayer, on the brief).
Gail M. Lambert, Deputy Attorney General, argued the cause for intervenor Department of Environmental Protection and Energy (Deborah T. Poritz, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel).
Jeffrey A. Walder argued the cause for intervenor County of Essex (Walder, Sondak, Berkeley & Brogan, attorneys).
The opinion of the court was delivered by GAULKIN, P.J.A.D.
DiBella Sanitation Service, Inc. (DiBella) and Anchor Carting Corp. (Anchor), licensed solid waste collectors operating in Passaic *240 County, were issued summonses by Passaic County Utilities Authority (PCUA), the agency designated by Passaic County to implement its solid waste management plan, for transporting solid waste out of Passaic County in violation of the plan and of a Department of Environmental Protection and Energy (DEPE) order. N.J.S.A. 13:1E-9d; N.J.A.C. 7:26-6.5q; see Middlesex County Health Dep't v. Browning-Ferris Indus., 252 N.J. Super. 134, 137, 599 A.2d 554 (App.Div. 1991). Following separate evidentiary hearings, the charges were sustained. DiBella and Anchor appeal.
DiBella and Anchor acknowledge, as they did in the trial court, that on the days charged they were transporting solid waste originating in Passaic County to transfer stations in Bergen County. And it is undisputed that both the Passaic County solid waste management plan and a then-outstanding DEPE emergency redirection of solid waste flow order required all solid wastes originating in Passaic County to be directed to facilities operated by PenPac, Inc. in Passaic County. DiBella and Anchor sought to justify their transporting Passaic County waste to Bergen County by reliance on the so-called "Pereira memo," a notice issued in 1983 to all solid waste collectors/haulers and facility operators by the then Deputy Director of the Division of Waste Management in the Department of Environmental Protection (now DEPE):
Policy concerning solid waste flow direction is contained in the Interdistrict and Intradistrict Solid Waste Flow Rules (N.J.A.C. 7:26-6 et seq.) jointly adopted by the Department of Environmental Protection (DEP) and the Board of Public Utilities (BPU) on December 6, 1982. These Rules designate specific solid waste disposal facilities to service waste streams originating from specific geographic areas (usually a municipality). While transfer stations are not included in these Waste Flow Rules, they may accept solid waste from various origins as long as the solid wastes, or a similar amount and type, are ultimately transported for disposal [to] the facility designated in the Rules to service the geographic area. (Note: This policy does not preclude the economic regulation of transfer stations by the BPU). Under no circumstances is a transfer station considered as the origin of the solid wastes leaving it. For purposes of determining where solid wastes shall be disposed of, the origin of the waste always remains the location where the waste was originally picked up before delivery to the transfer station.
The parties' principal dispute in the trial court, and again here, concerns the validity of the Pereira memo, which has long been in contention among DEPE, solid waste management districts and *241 the solid waste industry. A multitude of violation proceedings have been initiated by various solid waste management districts; they have apparently been held in abeyance pending disposition of this "test" case. In addition, three separate actions have been filed on behalf of industry members for declaratory and injunctive relief against districts that have assertedly refused to recognize the Pereira memo; those too have been stayed pending disposition of this case. See also Regional Recycling, Inc. v. New Jersey Dep't of Envtl. Protection & Energy, 127 N.J. 568, 571, 606 A.2d 815 (1992) (ordering proceedings to determine the validity and sufficiency of "DEPE's existing procedures, regulations, and rulings (including the so-called `Pereira Memo')" governing disposal by transfer stations of multi-district waste). During the pendency of these appeals, the Pereira memo has been incorporated and expanded in DEPE regulations, N.J.A.C. 7:26-2.11 to 6.9, 25 N.J.R. 4763 (October 18, 1993), which are challenged in actions now pending in this court brought by a majority of the solid waste management districts throughout the state.

I
DiBella and Anchor contend that the Pereira memo should have been accepted as a full defense to the charges that they unlawfully took Passaic County waste to a Bergen County transfer station. PCUA, joined by intervenor Essex County, responds that the Pereira memo was invalid and a nullity because (1) its authorization to transport waste other than as provided in the district plan violated the Solid Waste Management Act, N.J.S.A. 13:1E-1 to 207, and the Solid Waste Utility Control Act, N.J.S.A. 48:13A-1 to 13, and (2) the memo constituted "de facto rule-making" prohibited by the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to 15.
The trial judge denied pre-trial motions by DiBella and Anchor to dismiss the summonses, finding that "the Pereira policy is not a rule or regulation." But he ordered that DiBella and Anchor "individually will not be barred from arguing, on a case by case *242 basis, an affirmative defense based upon detrimental reliance upon the DEPE `Pereira policy.'" We hold that ruling to be sound: we are persuaded that principles of equitable estoppel and fundamental fairness should foreclose the imposition of penalties for actions taken in reliance on and in conformity with the Pereira memo, even if the issuance of that memo was substantively or procedurally flawed.
The equities are clear and compelling. Solid waste haulers must direct the waste flow in keeping with the governing district solid waste management plan. N.J.S.A. 13:1E-9; see generally Matter of Certain Amendments, 133 N.J. 206, 211-13, 627 A.2d 614 (1993). Those plans are effective only with DEPE approval granted in light of "the objectives, criteria, and standards developed in the Statewide solid waste management plan." N.J.S.A. 13:1E-24a(1). Although the district plan directs locally-generated solid waste to local facilities, DEPE instructed the industry in the Pereira memo that solid waste could properly be transported out of the district so long as the post-recycling residue, or its equivalent, is directed as the district plan requires. That authorization does not contradict any express statutory provisions; it could not be dismissed as an unauthorized or mistaken interpretation by a subordinate DEPE bureaucrat; nor were there any other factors suggesting that the Pereira memo was anything other than a reliable official pronouncement of DEPE. Solid waste haulers had every right to rely on the Pereira memo in conducting their business. Surely it would be highly inequitable for DEPE itself to penalize haulers for doing what they were thus invited to do; DEPE does not suggest otherwise. In our view, it is equally inequitable for PCUA to impose such penalties. PCUA operates under DEPE aegis in a statutory scheme designed for the "coordination" of solid waste activity. A.A. Mastrangelo, Inc. v. Commissioner of Dep't of Envtl. Protection, 90 N.J. 666, 672, 449 A.2d 516 (1982). If the responsible public agencies cannot coordinate their efforts, the haulers should not suffer the consequences.
*243 We draw our guidance from Airwork Service Division v. Director, Division of Taxation, 97 N.J. 290, 478 A.2d 729 (1984), cert. denied, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). Airwork there challenged sales tax assessments arising from its business of repairing airplane engines for out-of-state customers. The Supreme Court unanimously held that the applicable statute permitted imposition of the taxes, but split 4-3 in resolving Airwork's contention that the assessments were unwarranted because it had failed to collect the taxes from its customers in reliance on a Division of Taxation press release issued some four years earlier declaring such transactions to be exempt.
Speaking for the Court majority, Justice Handler described that contention to be "analogous to one based on principles of equitable estoppel." Id. at 297, 478 A.2d 729. The government can be estopped in appropriate circumstances, he said; the issue at hand was "whether the circumstances of this case warrant the unusual remedy of estopping the government from collecting taxes because the taxpayer has assertedly relied on earlier statements by the taxing authority." Ibid.
The majority declined to estop the Division. Noting that the issue "is extremely fact-sensitive," ibid., Justice Handler identified the following critical considerations: Airwork had not demonstrated reliance on "any definitive official conduct on the part of the Division"; "no express exemption is provided by the Act itself"; the press release was "published in a private, commercial tax news service [and] was not shown to be an official statement or pronouncement"; and the release "contained inaccuracies and outdated information, suggesting a lack of reliability." Ibid. Those facts justified adherence to the principle that the collection of taxes imposed by the Legislature "will usually outweigh the asserted reliance by a taxpayer, especially when such reliance is claimed to be based on unofficial statements and equivocal administrative inaction." Id. at 299, 478 A.2d 729.
Justice Garibaldi dissented, joined by Justices Clifford and Pollock, urging that "the retroactive imposition of the sales tax *244 produces such a harsh result that it offends fundamental concepts of fairness relating to agency conduct." Id. at 303, 478 A.2d 729 (Garibaldi, J., dissenting). She pointed out that Airwork "had no reason to believe it was not conforming to the Division's policy"; that Airwork had relied on the Division press release in not collecting sales tax from its customers; that Airwork could no longer collect the tax from the customers; and that the resultant hardship "is particularly worthy of note when the taxpayer could have been expected to refrain from the conduct that created his tax liability had he anticipated the tax." Id. at 304-05, 311, 478 A.2d 729. Since the assessments represented "a material and significant change" in Division policy as stated in the earlier press release, Justice Garibaldi argued that it could validly be adopted only on notice to affected taxpayers. Id. at 313, 478 A.2d 729; see Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 330, 478 A.2d 742 (1984).
We find here none of the factors relied upon by Justice Handler to deny estoppel relief. There is no danger of inhibiting the collection of taxes or any other essential public activity. An estoppel restricts only the imposition of sanctions for asserted misconduct; no public interest is frustrated if the government is barred from levying penalties for officially-authorized conduct. DiBella and Anchor do not rely on any privately published press release or other doubtful authority, but on a notice acknowledged to be a definitive DEPE statement, directed to and served upon all members of the regulated industry. The "definitive official conduct" absent in Airwork, 97 N.J. at 297, 478 A.2d 729, is thus present here. And, as stated by Justice Garibaldi in her Airwork dissent, DiBella and Anchor surely could have been expected to refrain from the conduct creating the penalties had they anticipated those consequences.
On these facts, then, we are satisfied that the trial judge correctly held that DiBella and Anchor could defeat the penalty claims by showing that they relied on, and acted in conformity with, the Pereira memo. Of course, the mere existence of the *245 Pereira memo is not sufficient to excuse a hauler's deviation from the provisions of a district solid waste management plan. Rather, as DEPE urges and DiBella and Anchor acknowledge, a hauler claiming a Pereira-memo defense must accept the burden of proving that the challenged transport conformed to the requirements of the memo. Thus, the hauler must show to the factfinder's satisfaction that the delivery was to a properly licensed transfer station that itself was subject to the memo's requirement that it return "the solid wastes, or a similar amount and type, ... for disposal to the facility designated in the Rules [to] service the geographic area." If, as in the case of DiBella, the hauler is also the operator of the transfer station, the hauler/operator must also assume the burden of proving that the residue-return requirements of the Pereira memo have been satisfied. We recognize that one of the difficulties in applying the Pereira memo is determining when or over what time period the required return of residue must be effected; we offer no present guidance on that matter, which must be addressed in the first instance on a case-by-case basis. If the hauler or hauler/operator meets its burden, no penalty can properly be imposed.[1]
In the present cases, the trial judge applied those principles and concluded that neither DiBella nor Anchor had sustained its burden of proving that it acted in conformity with the Pereira memo. Neither DiBella nor Anchor challenges those factual findings. We accordingly affirm the $1000 penalties imposed.

II
DiBella and Anchor further argue that they can not lawfully be sanctioned because the DEPE emergency redirection of solid *246 waste flow order, on which the district plan and the penalties were based, was invalidly adopted. We agree that the redirection order was invalid, but we conclude that DEPE regulations effective March 1, 1993, N.J.A.C. 7:26-6.5, 25 N.J.R. 991 (March 1, 1993), remedy the defect retroactively.
Matter of Certain Amendments, 133 N.J. 206, 627 A.2d 614 (1993), is dispositive. There the Department of Environmental Protection and the Board of Public Utilities (now DEPE) issued an emergency order redirecting Hudson County non-municipal waste. In a challenge brought by a recycling company, this court invalidated the order because it was adopted without compliance with the APA. Matter of Certain Amendments, 258 N.J. Super. 290, 298-300, 609 A.2d 501 (App.Div. 1992), aff'd in part and rev'd. in part, 133 N.J. 206, 627 A.2d 614 (1993). On appeal by Hudson County and DEPE, the Supreme Court declined to decide whether the emergency order was subject to the emergency rule-making provisions of the APA. Instead, finding that DEPE had failed to adhere to its own regulations, the Court held that "any procedural flaws or deficiencies may be remedied by the agencies" and that "the adoption of curative regulatory measures to validate the ... plan amendment may also be applied retroactively." 133 N.J. at 222-23, 627 A.2d 614.
The claim of invalidity advanced here is essentially the same as that urged in Certain Amendments, that is, that the DEPE emergency redirection order was not adopted in conformity with the APA. The asserted invalidity has been remedied by the 1993 amendments to N.J.A.C. 7:26-6.5 which retroactively codify the emergency redirection order DiBella and Anchor were charged with violating.

III
DiBella and Anchor also urge that PCUA lacked authority to issue the summonses because N.J.S.A. 13:1E-9d allows only "[t]he [DEPE] commissioner, a local board of health or county health department" to institute an action for violation of the Solid *247 Waste Management Act or a solid waste management plan adopted pursuant to that Act. We reject that contention.
Passaic County had adopted an environmental health work program pursuant to the County Environmental Health Act (CEHA), N.J.S.A. 26:3A2-21 to 35. That Act is designed "to provide for the administration of environmental health services by county departments of health throughout the State ... consistent with certain overall performance standards to be promulgated by [DEPE]." N.J.S.A. 26:3A2-22. "Environmental health" includes health and environmental programs relating to the control of solid waste. N.J.S.A. 26:3A2-23d. A "certified local health agency" is a local health agency that satisfies DEPE's standards. N.J.S.A. 26:3A2-23i. Pursuant to CEHA, Passaic County had first designated the Paterson Health Department and later the Passaic County Health Department as the agency responsible for implementing the CEHA work program. DEPE had approved the health work program.
As the agencies successively responsible for implementing the CEHA work program, the Paterson and Passaic County Health Departments were unquestionably authorized to institute proceedings for violation of the Solid Waste Management Act; DiBella and Anchor do not argue to the contrary. What is disputed is the validity of those agencies' contracts with PCUA authorizing PCUA "as agents of the County's Health Officer, ... [to] exercise all powers and duties for the regulation of Solid Waste as are confirmed [sic] upon the County's Health Officer, pursuant to N.J.S.A. 26:3A2-25."
We find those agreements to be valid under the Interlocal Services Act, N.J.S.A. 40:8A-1 to 11. That Act permits any "local unit," including a county or regional authority, N.J.S.A. 40:8A-2a, to contract with any other local unit to provide
through the agency of one [or] more of them on behalf of any or all of them, any service or aspect of a service which any of the parties on whose behalf such services are to be performed may legally perform for itself.
[N.J.S.A. 40:8A-5.]
*248 Although a public body or agency generally may not surrender its statutory power by contract, that general rule assumes the absence of specific contrary statutory authority. Newark v. Essex County Bd. of Chosen Freeholders, 221 N.J. Super. 558, 566, 535 A.2d 517 (App.Div. 1987), appeal dismissed, 114 N.J. 301, 554 A.2d 854 (1988); Mercer Council # 4 v. Alloway, 119 N.J. Super. 94, 99, 290 A.2d 300 (App.Div.), aff'd 61 N.J. 516, 296 A.2d 305 (1972). Here the contrary statutory authority, and its exercise in conformity with DEPE requirements, are unmistakable.
The remaining challenges advanced by DiBella and Anchor are clearly without merit. R. 2:11-3(e)(1)(E). The judgments are affirmed.
NOTES
[1] Needless to say, our ruling is applicable only to proceedings brought for activities prior to October 18, 1993, when the Pereira memo was superseded by DEPE regulations. We express no view as to standards or procedures applicable under the regulations. Nor do we need to consider whether the regulations, if sustained, might be applied retroactively. See Matter of Certain Amendments, 133 N.J. at 221-24, 627 A.2d 614.