685 A.2d 24

UNITED WATER RESOURCES INC. AND HUGH J. ROARTY, PLAINTIFFS–APPELLANTS, v. NORTH JERSEY DISTRICT WATER SUPPLY COMMISSION AND THE CITY OF BAYONNE, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 2, 1996—Decided November 26, 1996.

Before Judges LONG, RODRÍGUEZ and CUFF.

*Michael R. Cole* argued the cause for appellant United Water Resources, Inc. (*Riker, Danzig, Scherer, Hyland & Perretti*, attorneys; *Mr. Cole* of counsel; *Edward K. DeHope* and *Deborah J. Sokol* on the brief).

*Rinaldo M. D'Argenio* argued the cause for appellant Hugh J. Roarty (*Smith, Don, Alampi, D'Argenio & Arturi*, attorneys; *Mr. D'Argenio* and *Robert G. Goode* on the brief).

*H. Curtis Meanor* argued the cause for respondent North Jersey District Water Supply Commission (*Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello* and *Salerno, Cozzarelli, Mautone, DeSalvo & Nussbaum*, attorneys; *Mr. Meanor, Ralph J. Salerno* and *Joseph G. Nichols*, of counsel; *Mr. Meanor, H. Richard Chattman* and *William C. Sandelands*, on the brief).

*Joseph G. Nichols* argued the cause for respondent Bayonne.

*Dechert Price & Rhoads*, attorneys for amicus curiae, New Jersey – American Water Co., Inc. (*Ezra D. Rosenberg, Gil C. Tily* and *Sean Quinn*, of counsel; *Mr. Rosenberg* and *Bruce W. Clark*, on the brief).

The opinion of this court was delivered by

LONG, P.J.A.D.

The issue in this case is whether the North Jersey District Water Supply Commission (North Jersey) has the authority to operate, maintain and manage Bayonne's municipal water system and issue revenue bonds for that purpose. We have concluded that it does not.

*I*

Bayonne owns, and for many years has operated a retail water system for the use of its residents. This 65 mile long distribution system serves roughly 11,000 customers and has a capacity of 10 million gallons per day. The water for the system is supplied by North Jersey under a Water Supply Agreement dated January 25, 1982, which authorized North Jersey to develop and operate a water supply transmission facility (Wanaque South) at the expense of Bayonne and six other municipalities.

In 1995, Bayonne made a request for proposals (RFP) to obtain long-term services from a private firm to operate, maintain and manage all or part of its water system pursuant to the New Jersey Water Supply Public–Private Contracting Act which authorizes local government units to contract with private firms for the provision of water supply services. *N.J.S.A.* 58:26–19 to –27. On November 20, 1995, in response to the RFP, plaintiff, United Water Resources, Inc. (United Water), submitted a proposal to Bayonne to operate and maintain its water system. On the same date, North Jersey submitted its own proposal to operate and maintain Bayonne's water system based on the Interlocal Services Act, *N.J.S.A.* 40:8A–1 to –11. United Water's proposal was rejected. On March 20, 1996, the City Council of Bayonne introduced an ordinance authorizing its mayor to enter into a contract with North Jersey. This contract (the Bayonne Agreement) was executed on April 9, 1996.

Pursuant to the Bayonne Agreement, North Jersey promised, among other things, to operate and maintain Bayonne's water system; to prepare and collect all bills and invoices for the

customers of the system; to calculate, bill and collect the charges incurred by users of Bayonne's sewer system and to collect all rents, fees or other charges for direct or indirect connection to the Bayonne water system. In return, North Jersey is to pay Bayonne $25 million in three equal annual installments, to be used for undesignated purposes; another $6 million for water system improvements and/or repairs; and up to $2 million to pay the existing water capital debt of Bayonne. Additionally, North Jersey is to perform all of Bayonne's obligations under the preexisting Water Supply Agreement of 1982.

The term of the Bayonne Agreement is twenty years, with two optional ten year extensions. North Jersey plans to finance the Bayonne Agreement through the sale of $30 million in Wanaque East Water Services Division Revenue Bonds, Series 1986. In turn, North Jersey is authorized to retain up to $700,000 in Bayonne water receivables.

In furtherance of the Bayonne Agreement, North Jersey also entered into a subcontracting arrangement with the East Orange Board of Water Commissioners (East Orange) whereby East Orange, which has experience in the field, will provide certain billing and collection services for Bayonne.

On May 31, 1996, plaintiffs, United Water and Hugh A. Roarty, a Bayonne resident, filed a verified complaint in lieu of prerogative writs against North Jersey and Bayonne alleging their lack of authority to enter into the Bayonne Agreement. North Jersey moved to dismiss the complaint on June 18, 1996. Despite the pendency of the litigation, North Jersey began performing pursuant to the Bayonne Agreement by making initial payments to Bayonne. In light of this, plaintiffs applied to the trial judge for temporary restraints, which were denied. Subsequently, on July 8, 1996, plaintiffs filed a cross-motion for partial summary judgment on the issue of whether the Bayonne Agreement is authorized by law.

The trial judge considered both motions together. By Order dated July 19, 1996, he granted North Jersey's motion and denied

plaintiffs' cross-motion. In so doing, he held that neither North Jersey's 1916 enabling legislation, *N.J.S.A.* 58:5–1 to –30, nor the Water Facilities Transmission Act of 1962, *N.J.S.A.* 58:5–31 to –58, provides authority for North Jersey to enter into the Bayonne Agreement. He concluded, however, that the Bayonne Agreement is authorized by the Interlocal Services Act. *N.J.S.A.* 40:8A–1 to –11. He also held that North Jersey has the inherent authority to issue bonds for the purposes specified in the Bayonne Agreement. Plaintiffs appeal. We reverse.

## II

Several enactments provide the backdrop for our opinion. In 1916, the Legislature created two water supply districts: North Jersey, consisting of the twelve northern counties of Sussex, Warren, Hunterdon, Passaic, Morris, Monmouth, Somerset, Bergen, Essex, Union and Middlesex; South Jersey covering the remaining counties. *N.J.S.A.* 58:5–1. The districts were created to provide a water supply to contracting municipalities.

Under its enabling legislation, North Jersey is "a body corporate with power to sue and be sued, and with the right to acquire, hold, use, lease and dispose of all such property as may be necessary for the uses and purposes for which [North Jersey] was created, and with all other necessary powers incident to corporate bodies." *N.J.S.A.* 58:5–7. Any municipality desiring a new or additional water supply is authorized to petition North Jersey for a preliminary estimate of the cost to the municipality of such a supply, with the cost of the estimate to be borne by the municipality. *N.J.S.A.* 58:5–9. Other municipalities may join in the petition, and pay their pro rata share of the preliminary costs. *N.J.S.A.* 58:5–11. Thereafter, North Jersey is required to formulate plans for obtaining a new or additional water supply for the petitioning municipalities and to estimate the cost thereof, along with the pro rata share which each of the participating municipalities would be called upon to pay. North Jersey is also required to supply a form of contract providing for the raising and payment of the

funds necessary to meet the cost of acquisition and operation of the water supply. *N.J.S.A.* 58:5–12. Each municipality has the opportunity to accept the contract or to withdraw from further participation. *N.J.S.A.* 58:5–13. Upon acceptance of the final form of contract, each participating municipality is required to introduce the proper ordinances or resolutions necessary to appropriate the monies required to carry out the contract.

The power of North Jersey to carry out its obligations is set forth in *N.J.S.A.* 58:5–16. This grant is broad, including the right, at the expense of the contracting municipalities, to "acquire by purchase or condemnation any part or all of the water plant, water rights, easements, distribution system or other property of any existing private corporation or of any other water company." *N.J.S.A.* 58:5–16. North Jersey may also acquire by purchase or condemnation "lands, easements, rights of way, water rights and all other property and rights needful for the construction of any reservoir or the obtaining of any water supply, or the laying of any pipes or mains, or the doing of any work, necessary for the acquisition, construction or operation of such water supply." *Ibid.* In addition, North Jersey is granted the following:

> [A]ll other powers necessary or proper to provide all of the contracting municipalities in the water supply district with a sufficient water supply, including the right to contract with any municipality, corporation, person or other district water supply commission for the purchase, sale or exchange of any water, lands or other property, but the commission or any municipality shall not enter into any new contracts for the sale or delivery of water to any corporation, firm or person for use within the limits of any other municipality without the written approval and consent of such other municipality.
>
> [*Ibid.*]

Other non-contracting municipalities are authorized to petition North Jersey for water and, if the supply is available, North Jersey must furnish such surplus water to them at a price equivalent to an equitable share of the cost of acquiring and operating the water supply. *N.J.S.A.* 58:5–25 and –26.

In 1958, because of an acute need for new water supplies in the state's northeastern counties and the Raritan Valley, the New Jersey Water Supply Law, 1958 (Water Supply Law), *N.J.S.A.*

58:22–1 to –19, was enacted. Pursuant to this law, the Department of Conservation and Economic Development (redesignated as the Department of Environmental Protection) was authorized to plan, develop, acquire, construct and operate reservoirs at Round Valley and Spruce Run to serve the affected areas. *N.J.S.A.* 58:22–1 and –4.

In 1962, the Water Transmission Facilities Act (Transmission Act) was signed into law. *N.J.S.A.* 58:5–31 to –58. The Transmission Act was prompted by the enactment of the earlier Water Supply Law. The purpose of this Act was to permit transmittal and delivery of water from the recently developed reservoirs "to interested municipalities by means of facilities assembled, constructed and operated by the North Jersey District Water Supply Commission." *North Jersey Dist. Water Supply Comm'n v. City of Newark,* 103 *N.J.Super.* 542, 544, 248 *A.*2d 249 (Ch.Div.1968), *aff'd,* 52 *N.J.* 134, 244 *A.*2d 113 (1968). The Transmission Act gives North Jersey the authority "to assemble, acquire, operate and maintain transmission facilities adequate to carry this new water supply to those municipalities in the northern part of the State that wished to and could take advantage of it." *Ibid.*

The Transmission Act authorizes North Jersey to acquire and dispose of revenues in its own name, to secure the payment of bonds and notes and, to carry out the purposes of the Act, to own, construct and operate water transmission facilities, to enter into contracts with any municipality or person for the sale or exchange of water. *N.J.S.A.* 58:5–36. North Jersey is also empowered, subject to the provisions of the Water Supply Law, to enter into contracts providing for or relating to "the treatment, filtration, transmission or distribution of any supply of water made available by the State." *N.J.S.A.* 58:5–37. The three aforementioned statutes are cognate enactments with an overarching purpose – i.e., to provide and transmit a water supply to the municipalities of the State.

One other general statute has relevance here. It is the Interlocal Services Act, *N.J.S.A.* 40:8A–1 to –11, which has as its purpose

the joint provision of services by independent government units for the purposes of economy and efficiency. One relevant section of the Act provides:

> Any local unit of this State may enter into contract with any other local unit or units for the joint provision within their several jurisdictions of any service which any party to the agreement is empowered to render within its own jurisdiction.
> [*N.J.S.A.* 40:8A–3].

Additionally, *N.J.S.A.* 40:8A–5 sets forth the following:

> The parties to a contract authorized by this Act may agree to provide jointly, or through the agency of one or more of them on behalf of any or all of them, any service or aspect of a service which any of the parties on whose behalf such services are to be performed may legally perform for itself.
> [*N.J.S.A.* 40:8A–5].

Bayonne, a municipality, and North Jersey, a regional district, both qualify as "local units" under the definition in *N.J.S.A.* 40:8A–2(a). It is against this statutory backdrop that we consider the issues presented.

### III

Initially, the trial judge determined that North Jersey's enabling legislation does not provide it with authority to enter into the Bayonne Agreement:

> While the powers granted by the enabling Act are broad, they must be exercised by [North Jersey] only for the purposes of advancing its legislative mandate. The broad grant of powers may not be used as a boot strap to redefine or expand the purpose for which [North Jersey] was created. That purpose is clearly confined to obtaining new or additional water supplies for contracting municipalities at their expense. The Legislature contemplated that [North Jersey] would act as a facilitator for one or more municipalities in the acquisition and development of new sources of potable water and the construction and operation of the infrastructure, consisting of pumping stations, aqueducts, connections and transmission lines necessary to deliver water to each contracting municipality. There is no room in the mission for [North Jersey] to supplant either a local utility or a municipal government in the operation and maintenance of a municipal water distribution system. The development of a water supply for municipalities and the operation of a municipal water department are different enterprises, and authorization to undertake the former does not include the latter.

The judge went on to analyze the Transmission Act and concluded that it, like the enabling legislation, does not authorize North Jersey to enter into the Bayonne Agreement:

[T]he original enabling legislation dealt with the acquisition of water supplies by municipalities through the agency of [North Jersey]. The expenses of damming and pumping to create and distribute the water are at municipal expense. The 1962 act dealt with a new supply of water developed at State expense. With regard to these sources of water, [North Jersey] is authorized to construct the transmission infrastructure from the state-developed source to municipalities willing to contract to pay for the cost of construction and operation of the transmission facility.

The contract with Bayonne does not have as its purpose the securing, transmitting or maintaining of adequate supplies of potable water to the City of Bayonne. The City of Bayonne is already assured an adequate supply of potable water pursuant to the Water Supply Agreement dated January 25, 1982. The contract in question calls for [North Jersey] to operate the internal water distribution system of the City of Bayonne, to maintain and improve the infrastructure and to operate a billing and collection service. Nothing in the original Act or the 1962 Act indicates that the Legislature contemplated that [North Jersey] would supplant services traditionally provided by municipal government. The purpose of the Water Facilities Transmission Act was to authorize and prompt [North Jersey] to construct water transmission facilities. It did not confer authority to lay out $27 million in cash in order to acquire the right to take over an existing municipal water distribution system, to improve the billing and collection procedures of the local system or to rescue an inefficiently run municipal water department. That is not what the Legislature had in mind either in 1916 or in 1962.

. . . .

The new business [North Jersey] has decided to start for itself is not part of its legislative mandate. The statement suggests that the [North Jersey] bureaucracy, having virtually completed its assigned task of developing water supply and transmission facilities, is unwilling to wind up or scale down its operations. Instead, it is looking for new missions with which to occupy itself. The service that [North Jersey] seeks to provide to municipalities may be extremely beneficial. Nonetheless, [North Jersey] may not arrogate new powers to itself.

■ We agree fully with the trial judge's conclusion that North Jersey's enabling legislation and the Transmission Act do not authorize the Bayonne Agreement. Those statutes, which govern North Jersey's functions and specifically delineate its powers and duties, confine North Jersey to the wholesale provision and transmission of a water supply to municipalities and do not include the retail operation of a municipal water system. Presumably, the Legislature is aware that North Jersey "has virtually completed its assigned task of developing water supply and transmission facilities" and is unwilling to "wind up or scale down its operations." If the Legislature had intended to redefine North Jersey's mission by allowing it to enter into a business different from the

wholesale provision of water, it could easily have so provided. We know, for example, that the Legislature understands how to authorize an entity to operate a municipal water system because it did so as recently as 1995 when it enacted the New Jersey Water Supply Public–Private Contracting Act. *N.J.S.A.* 58:26–19 to –27. Its concomitant failure to authorize North Jersey to venture into the retail end of the water supply business, to us, speaks volumes. Thus, we affirm the trial judge's holding that the power to enter into the Bayonne Agreement does not repose in North Jersey's enabling legislation or the Transmission Act.

### IV

■ The trial judge turned finally to the authority provided by the Interlocal Services Act. He acknowledged that its purpose is to encourage and enable local units to consolidate essential governmental services, to avoid wasteful duplication and to better enable the provision of services on a regional level. He went on to interpret the term "local unit" to encompass North Jersey and rejected plaintiffs' argument that the Act does not authorize a public entity to delegate authority to another to perform a service that the delegee lacks authority itself to perform. "The intent of the Legislature is clear from the language of the Act and requires only that the local unit for whose benefit the services are performed have authority to perform that service for itself." In sum, he concluded that the Bayonne Agreement is within the broad contemplation of the Interlocal Services Act, thus providing North Jersey with the authority to enter into it. It is here that we part company from the trial judge.

We turn again to the words of the Interlocal Services Act. *N.J.S.A.* 40:8A–3 provides in pertinent part:

> Any local unit of this State may enter into a contract with any other local unit or units for the joint provision within their several jurisdictions of any service which any party to the agreement is empowered to render within its own jurisdiction.

*N.J.S.A.* 40:8A–5, in part, provides:

> The parties to a contract authorized by this act may agree to provide jointly, or through the agency of one or more of them on behalf of any or all of them, any

service or aspect of a service which any of the parties on whose behalf such services are to be performed may legally perform for itself.

As the parties' arguments reveal, these sections present a linguistic ambiguity. North Jersey and Bayonne contend that the Legislature's use of the term "any" (i.e., "any service which any party ... is empowered to render within its own jurisdiction" and "any service ... which any of the parties ... may legally perform for itself") literally supports the trial judge's conclusion that a local unit with the authority to perform a service may simply contract it out to another local unit, not so empowered. That is what occurred here when Bayonne hired North Jersey to run its water system.

Plaintiffs counter that the phrase "may enter into a contract ... for the joint provision within their several jurisdictions of any service" has a contrary and unequivocal meaning: that each local unit must be legally authorized to provide the service contracted for, and that the service, in fact, must be jointly provided to the citizens of both contracting units.

■ In determining how to resolve this ambiguity, the legislative object in enacting the Interlocal Services Act is polestar. *Square Brighton Corp., Inc. v. City of Atlantic City,* 287 *N.J.Super.* 450, 455, 671 *A.*2d 203 (App.Div.1996), *certif. granted, City of Atlantic City v. Cynwyd Investments,* 145 *N.J.* 373, 678 *A.*2d 714 (1996). *See also, The Jersey City Chapter of the Property Owner's Protective Ass'n v. City Council of Jersey City,* 55 *N.J.* 86, 100, 259 *A.*2d 698 (1969) ("[w]hen all is said and done, the matter of statutory construction ... will not justly turn on literalisms, technisms or the so-called formal rules of interpretation; it will justly turn on the breadth of the objectives of the legislation and the commonsense of the situation."); *See also Schierstead v. City of Brigantine,* 29 *N.J.* 220, 230, 148 *A.*2d 591 (1959) ("statutes are to be read sensibly rather than literally and the controlling legislative intent is to be presumed 'consonant to reason and good discretion.' "). Thus, the legislative intent behind the Interlocal Services Act is our point of departure.

The Interlocal Services Act is one of a series of legislative initiatives designed to promote economy and efficiency in government by fostering the joint provision of governmental services by local units. *See, e.g.,* Consolidated Municipal Service Act, *N.J.S.A.* 40:48B–1 to –21; Interlocal Services Aid Act, *N.J.S.A.* 40:8B–1 to –9; Optional County Charter Law, *N.J.S.A.* 40:41A–1 to –149.[1] The legislative object of these and other similar enactments is the creation of inter-governmental partnerships by local units to jointly provide services to their citizens. Their aim is the avoidance of duplication, and the fostering of regionalization with concomitant economies and efficiencies of scale. This is the leitmotif which runs throughout all of them.

We commented on this specifically in relation to the Interlocal Services Act in *McIntosh v. DeFilippo,* 281 *N.J.Super.* 171, 177, 656 *A.*2d 1287 (App.Div.1995):

> The Interlocal Services Act, *N.J.S.A.* 40:8A–1 *et seq.,* permits municipalities to *pool their resources and provide joint services to their residents.* The Interlocal Services Act ... amended the Department of Community Affairs Act of 1966 (P.L.1966, c. 293: *N.J.S.A.* 52:27D–1 *et seq.*) and the Consolidated Municipal Service Act, (P.L.1952, c. 72; *N.J.S.A.* 40:48B–1 *et seq.*), and *permitted political subdivisions of the State to provide services jointly.* (emphasis added).

The legislative history of the Act supports this view, as do the reports of the County and Municipal Government Study Commission which were relied upon in its enactment. *See* Interlocal Services Act Bill Statement, S.306, at 11–12 (pre-filed for introduction in 1972 session); Legislative Notes on *N.J.S.A.* 40:8A–1 *et seq.* (Oct. 1, 1975); *Joint Services – A Local Response to Area Wide Problems, County and Municipal Government Study Commission* (3rd Report, Sept. 1970); *Consolidation, Prospects and Problems, County and Municipal Government Study Commission* (5th Report, Feb. 1972); *County and Municipal Government Study Commission* (Jan. 1973).

---

[1] Other statutes authorizing cooperative efforts between government units are set forth at 35 *New Jersey Practice, Local Government Law* § 328, at 21 (Michael A. Pane) (2nd ed. 1993).

These studies focused on the problems associated with New Jersey's fragmented system of local government and the benefits of consolidating local government services. In 1972, the County and Municipal Government Study Commission summarized its viewpoint that:

Consolidation is recommended to New Jersey municipalities as a means toward more rational control of growth and development, more efficient provision of local services, more viable and capable public administration and the healing of local government fragmentation, in those situations where bonds of interdependence form a recognized community of interest between or among the municipalities.

*Consolidation, Prospects and Problems,* at 3. Senator James S. Cafiero, one of the sponsors of the Interlocal Services Act, summarized the intent of the legislation as follows:

Under provisions of these acts, any local governing unit or units of the state may enter into a contract with any other local unit for the *joint provision within their several jurisdictions of any service they are already empowered to render individually.*

[*Service Plan Act Funded,* Atlantic City Press, December 25, 1973, at 26 (emphasis added).]

It is obvious to us from the legislative history of the Interlocal Services Act that it was not intended as a vehicle to enhance the enumerated powers granted to local units by the Legislature. Rather, its mission was to facilitate the most efficient and economic exercise of powers already granted by law, through cooperative activity among local governmental units with similar powers, needs and goals. The only reading of the Act which is consistent with this purpose is that two or more local units, empowered to render a service, may contract for the joint provision of that service within their jurisdictions. The efficiencies and economies which the Legislature sought to foster, and which are attendant upon such joint provision of services, simply do not occur where, as here, a local unit essentially contracts out one of its obligations to another local unit, the latter lacking the experience and the independent authority to provide the service to itself.

What the Act contemplates is two or more local units with similar powers and duties providing a particular service jointly, or under the auspices of one of them, to all of their constituents. For

example, under the Act, Jersey City, Bayonne and Kearny could contract for joint plumbing code inspections. The counties of Union, Essex and Hudson could contract for the joint provision of social services. Likewise, two or more counties could join together to provide recreational and cultural facilities, perhaps under the auspices of one of them. Indeed, *N.J.S.A.* 40:8B–5, the Interlocal Services Aid Act, companion legislation to the Interlocal Services Act, specifically cites such functions as warranting joint service program grants.

We note that the inclusion of regional authorities within the scope of the Interlocal Services Act does not alter the basic purpose of the Act and does not provide power for Bayonne to hire North Jersey to run its water system. On the contrary, it merely extends to regional authorities already empowered to provide a particular service, the right to jointly provide that service with other regional authorities or local units also so empowered.

A contrary interpretation would allow a governmental entity to redefine its mission at will and thus offend the rule that an administrative agency is constrained to act within the "boundaries of the legislative delegation." *Last Chance Development v. Kean,* 232 *N.J.Super.* 115, 127, 556 *A.*2d 796 (App.Div.1989). Plainly, the Interlocal Services Act was not intended to facilitate the transfer of statutory authority from a local unit possessing such power, to another entity, which is devoid of such power. The use of the word "joint" connotes that the service being provided must be within the statutory empowerment of each party to the agreement. None of the services North Jersey has contracted to provide Bayonne is within North Jersey's statutory authority.

To the extent that *Passaic County Util. Auth. v. DiBella Sanitation Serv.,* 272 *N.J.Super.* 238, 639 *A.*2d 745 (App.Div.1994), cited by North Jersey, can be read to support a contrary interpretation, we respectfully disagree with it. There we upheld the power of the Passaic County Utilities Authority to enforce Passaic County's solid waste management plan under an agreement with

the Passaic County Health Department. *DiBella, supra,* 272 *N.J.Super.* at 247, 639 *A.*2d 745. The issue before us was whether a county health department could delegate its statutory authority to engage in waste flow enforcement to a county utilities authority. We found that such intra-county delegation was permissible. *Id.* at 248, 639 *A.*2d 745. While it is true that the opinion in *DiBella* suggests in dictum that the Interlocal Services Act supplied authority for the agreement, it is clear that that statute has no applicability to transfers of power to agencies within a single county because such agencies are not "local units." *N.J.S.A.* 40:8A–2(a).

## V

This ruling makes it unnecessary for us to grapple with the numerous questions which have been advanced as to North Jersey's authority to bond in furtherance of the Bayonne Agreement. We add only this. Whatever inherent or express authority exists for North Jersey to issue bonds under its enabling legislation or the Transmission Act [2] is limited to furthering the goals of those acts; to wit: the wholesale provision of a water supply to municipalities. Any other business, unrelated to the goals of the original enabling legislation or the Transmission Act, which North Jersey chooses to engage in, would plainly be beyond the scope of its bonding power.

Reversed.

---

[2] *See State ex rel. Dep't of Health v. North Jersey Dist. Water Supply Comm'n,* 127 *N.J.Super.* 251, 268, 317 *A.*2d 86 (App.Div.1974), *certif. denied,* 65 *N.J.* 578, 325 *A.*2d 712 (1974), *cert. denied,* 419 *U.S.* 999, 95 *S.Ct.* 314, 42 *L.Ed.*2d 273 (1974) and *K.S.B. Technical Sales Corp. v. North Jersey Dist. Water Supply Comm'n,* 75 *N.J.* 272, 285, 381 *A.*2d 774 (1977).