215 N.J. Super. 564 (1987)
522 A.2d 485
STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION AND THE NEW JERSEY PINELANDS COMMISSION, PLAINTIFFS-APPELLANTS,
v.
JOHN LEWIS, INDIVIDUALLY; OCEAN SEWER & SEPTIC SERVICE, INC., AND GARDEN STATE SOIL ENRICHMENT STATION, INC., CORPORATIONS OF THE STATE OF NEW JERSEY; TIMOTHY LEWIS, AND THE ESTATE OF MAMIE ROBERTSON, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted February 17, 1987.
Decided March 12, 1987.
*566 Before Judges PETRELLA, BILDER and SCALERA.
W. Cary Edwards, Attorney General of New Jersey, attorney for appellants (James J. Ciancia, Assistant Attorney General, of counsel; Brian D. Smith, Deputy Attorney General, on the brief).
Gregory H. Wheeler, attorney for respondents and on the letter brief.
The opinion of the court was delivered by PETRELLA, P.J.A.D.
In this civil enforcement action brought by the State, defendant John Lewis,[1] and two corporations in which he is the principal, defendants Ocean Sewer and Septic Service, Inc. and Garden State Soil Enrichment Station, Inc., were found to have illegally dumped large quantities of sewage and septage onto properties owned or controlled by Lewis in Manchester Township, Ocean County. The Chancery judge granted the State a temporary injunction and other relief, including assessment of a $2,500 counsel fee against Lewis, but refused to assess certain *567 statutory penalties for violations of the Solid Waste Management Act, N.J.S.A. 13:1E-1, et seq., and the Water Pollution Control Act, N.J.S.A. 58:10A-1, et seq., or to require defendants to finance a comprehensive ground water study to determine the extent of any environmental damage caused by his activities. The State's appeal is limited to challenging the judge's refusal to impose such fines and remedies.
Lewis owns certain properties located in Manchester Township assessed to him on the tax rolls and denominated thereon as Block 77, Lots 2, 4, 5, 6, 7 and 8, and controls and pays taxes on Lot 9 whose record owner is the Estate of Mamie Robertson. Garden State Soil Enrichment Station, Inc. (GSSES), a corporation in which Lewis is president,[2] conducted commercial operations on those properties. At the time of trial the property, consisting of approximately 91 contiguous acres, had an assessed value of approximately $100,000. The property is located in the Pinelands Protection Area and is thus within the jurisdiction of the New Jersey Pinelands Commission (Commission). Lewis is also president of defendant Ocean Sewer and Septic Service, Inc. (OSSS) which is in the business of collecting and transporting commercial and residential sewage.[3]
The trial judge found that Lewis had been dumping domestic sewage and sludge onto the property since early 1977 in connection with the operation of his businesses. This sewage dumping activity was discovered during the winter of 1980-1981 by site inspectors for the Commission. Complaints from neighboring property owners were also received. At that time Lewis was initially advised that such dumping without the appropriate permits and approvals was illegal.
*568 Lewis had apparently begun the permit and approval application process some time before this, for on January 6, 1981 the Commission granted him approval for the construction of a municipal sewage sludge composting facility on the property, limited to the receipt of 10 dry tons of sludge per day. In May 1981 the Commission issued a public acknowledgement that it had received a completed application from Lewis for a second approval to apply liquid septage and sewage onto various parts of the property. In July 1981 the Department of Environmental Protection (DEP) issued Lewis a one-year permit for that activity. DEP issued him a second permit in August 1981 for construction of a "dewatered municipal sewage sludge composting facility" on another portion of the property. This permit was to have a two-year term.
All of these various approvals and permits contained conditions and restrictions relating to how the different operations could be conducted. These conditions had to be accepted by Lewis before he could legally do business. Lewis gave his written acceptance to all of the conditions in the DEP permits, and orally agreed to other conditions imposed by the Commission. At some point after these permits and approvals were issued, Lewis brought suit in the Superior Court challenging the conditions contained therein. The case was subsequently transferred to the Office of Administrative Law (OAL) where, after hearings before an Administrative Law Judge (ALJ), an initial decision was issued on October 15, 1982 upholding the validity of all the conditions as they applied to Lewis. However, during the pendency of those proceedings, Lewis' permit for land application of sewage and septage expired. His application to extend the term of that permit until resolution of his challenges to those administrative determinations was rejected by the DEP. In its final administrative determination on November 23, 1982 the DEP accepted the ALJ's findings and conclusions.
Prior to and during the pendency of the proceedings before the ALJ, the Lewis property was the subject of various State *569 inspections. In September and December 1981 DEP inspectors attempted to gain access to the property, but were denied entry by Lewis. This was in direct violation of conditions contained in the permits regarding DEP's right of entry to the property. In January 1982 a Commission inspector, standing on a road outside the Lewis property, observed a tanker truck discharging liquid onto the ground.
Based on these observations, inspectors for the DEP and the Commission obtained an administrative search warrant which was executed in March 1982. Evidence of large scale sewage and septage dumping on the properties was discovered. In addition, Commission inspectors determined that dumping was also occurring within 300 feet of previously identified wetlands located on the property in violation of conditions contained in the Commission's prior approvals. Photographs of the area and samples of the waste found on the surface of the ground were taken for analysis.
In January 1983, after expiration of the land application permit, the property was again placed under surveillance because DEP had no record that the waste that OSSS was collecting in the course of Lewis' operations was being disposed of at any licensed treatment plant or facility in the State. DEP inspectors again observed OSSS tanker trucks discharging large quantities of liquid onto the property. A second and third set of administrative search warrants, executed in February 1983 and December 1984, disclosed further dumping of waste on the property. On one occasion, DEP inspectors monitored an OSSS truck as it collected sewage from several residential customers in Manchester Township. The truck was followed to the property where its driver was found discharging liquid waste onto the ground. On all of these occasions photographs of the area and samples of the material contained in the truck and deposited on the ground were taken for analysis.
In early 1985 the DEP, acting pursuant to additional warrants, entered the property and installed four monitoring wells *570 in an effort to determine whether the ground water had been contaminated. Water samples were also taken from private residential wells located to the north and northeast of the property and from a stream known as Hurricane Brook which runs behind and through the Lewis property. These samples were delivered to the State Department of Health for analysis which confirmed the presence of human fecal matter with high levels of streptococci and coliform bacteria.
On May 14, 1985 the DEP and Commission filed suit against defendants, alleging violations of the Solid Waste Management Act, N.J.S.A. 13:1E-1, et seq.; Water Pollution Control Act, N.J.S.A. 58:10A-1, et seq.; Pinelands Protection Act, N.J.S.A. 13:18A-1, et seq.; Environmental Rights Act, N.J.S.A. 2A:35A-1, et seq., and alleging common law nuisance and strict liability claims. The State sought the imposition of statutory penalties, a permanent injunction against the further disposal of waste onto the property, surveillance of the property by installation of additional monitoring wells and the financing by defendants of a comprehensive ground water study to determine the extent of any environmental damage. The State also sought a performance bond from defendants, the forfeiture of all OSSS vehicles and equipment, along with the DEP license for hauling waste, and the assessment of punitive damages, costs of suit, counsel and expert witnesses' fees.
At trial the State produced expert testimony establishing that samples of ground water taken from the site on various occasions contained elements of bacteria indicative of high concentrations of human waste. Dr. Helen Chase of the DEP testified that these levels greatly exceeded the State's standards for potable water and indicated that the surface of the ground had been "overloaded" with waste materials beyond the capacity of the soil to handle. The Commission's experts also indicated that the ground water was contaminated and that the contamination was having a "serious detrimental and deleterious" impact upon the adjacent wetlands. Tests of samples taken *571 from the adjacent residential wells showed little or no contamination at that time.
Other experts testified that the Lewis property was located over a portion of the Cohansey Aquifer which supplies water to many residential and commercial users in southern New Jersey. DEP investigations indicated that the aquifer was being contaminated by sewage dumped onto the surface of the Lewis property.
Defendants' expert witness, Dr. Elliot Epstein, criticized the State's water testing methods and opined that it was impossible to determine the level of pollution caused by any particular activity unless background levels from the site, relating to the elements tested for, were known. Epstein asserted that other activities, such as the prior use of the property as a farm, could have caused or contributed to the pollution problem. Testimony from area residents indicated that the property had previously been used for farming and that large amounts of animal waste had frequently been applied to the land as fertilizer.
The Chancery judge found that Lewis had engaged in extensive dumping on the property in violation of various environmental laws. Although permits and approvals had been applied for and obtained, Lewis had not complied with conditions fixed in those permits and approvals. The judge concluded that the ground water under the property was polluted, and that the area environment in general, and adjacent wetlands in particular, had been adversely affected. These adverse effects and the pollution of the Cohansey Aquifer were caused by defendants' application to the land of grossly excessive amounts of sewage which could not be digested by the soil and vegetation.
The judge concluded that all of the asserted statutory violations had been established, but that the damage to the environment had not been extensive or permanent and that Lewis, by applying for permits, had evidenced a willingness to comply with the law. The judge granted a temporary injunction against further dumping until the proper permits could be *572 obtained. He denied plaintiffs a permanent injunction, as well as forfeiture of Lewis' hauling license and equipment, because he felt that would unreasonably interfere with defendant's livelihood. He also assessed a counsel fee against defendant of $2,500 and allowed the DEP to continue monitoring the wells on the property. The judge rejected, as being without merit, Lewis' contention that the environmental laws were being selectively and arbitrarily enforced against him.[4]
The judge felt that statutory penalties equated with punitive damages, and that the standards set forth in Nappe v. Anschelewitz, Barr, Ansell and Bonello, 97 N.J. 37 (1984), would apply. He thus opined that statutory penalties should only be awarded where there had been intentional wrongdoing in the sense of an evil-minded act or an act accompanied by the wanton and willful disregard of the rights of another. Erroneously equating statutory penalties with punitive damages, the judge also concluded that defendant's conduct was not so outrageous that penalties should be imposed, noting that, because of Lewis' financial status, such penalties would probably be uncollectible anyway. The State's request for a ground water study was similarly disallowed based on the judge's finding that the need for one had not been proven and that the alleged astronomical costs involved were beyond defendant's financial abilities. A motion for reconsideration of the refusal to impose the latter remedies was subsequently denied by the trial judge.
We disagree with the judge's analysis. The cited statutes giving rise to imposition of civil penalties and remedies neither refer to nor require a finding of intent to violate the act before their remedies may be invoked. In that regard they are clearly akin to "strict liability" statutes, see State v. Harris, 214 N.J. Super. 140, 148 (App.Div. 1986), the violation of which *573 can result in civil penal sanctions regardless of moral culpability or the need for a finding of mens rea such as is often the case under the criminal law. The penalty section of the Solid Waste Management Act, N.J.S.A. 13:1E-9f,[5] provides that any person who violates the Act or its accompanying regulations "shall be liable to a penalty of not more than $25,000 per day" to be collected in an action filed in the Superior Court. Similarly, the penalty section of the Water Pollution Control Act, N.J.S.A. 58:10A-10e, states that violators "shall be subject upon order of a court to a civil penalty not to exceed $10,000 per day of such violation...." Only the doing of the proscribed act need be shown. Department of Health v. Concrete Specialties, Inc., 112 N.J. Super. 407, 411 (App.Div. 1970); Department of Labor & Industry v. Rosen, 44 N.J. Super. 42, 50 (App.Div. 1957); State v. Kinsley, 103 N.J. Super. 190, 193 (Cty. Ct. 1968), aff'd 105 N.J. Super. 347 (App.Div. 1969).
Our recent opinion in State v. Harris, supra, 214 N.J. Super. at 140, dealt specifically with imposition of civil penalties under the Solid Waste Management Act, N.J.S.A. 13:1E-9. We stated in Harris that the civil penalty provision of that act "does not stipulate that either willfulness or intention to violate must be proven before a penalty is imposed." Id. at 147. We also note that other provisions of the Solid Waste Management Act (N.J.S.A. 13:1E-9g) and the Water Pollution Control Act (N.J.S.A. 58:10A-10f) specifically address knowing, willful or intentional violations, and in such cases provide for criminal sanctions. The trial judge's view of the penalty provisions of the applicable environmental statutes runs counter to their stated purposes and to the legislative mandate to liberally construe those statutes to carry out their beneficent purposes to protect the public health, safety and welfare. See N.J.S.A. 13:1E-35; N.J.S.A. 58:10A-12; N.J.S.A. 13:18A-29; and N.J.S.A. 2A:35A-13.
*574 The amount of the penalty imposed is generally within the sound discretion of the trial judge. Cases dealing with the imposition of penalties under other strict liability statutes have made it clear that while the absence of intent or mens rea may be a basis for mitigation, it does not completely obviate liability for the violation. State v. Koziol, 157 N.J. Super. 499, 502-503 (App.Div. 1978). See also United States v. Sanchez, 520 F. Supp. 1038, 1040-1041 (S.D.Fla. 1981), aff'd 703 F.2d 580 (11th Cir.1983). "The number of violations, their frequency, the precautions taken to prevent further mishaps and the circumstances under which the offenses occurred are all relevant factors in determining the penalty." Department of Health v. Concrete Specialties, Inc., supra, 112 N.J. Super. at 411. Other factors to be taken into account here include the operation by defendants of a commercial business for profit (which business presumably made profits at the expense of the public's health, safety and welfare), in part without necessary permits and in part in violation of permit conditions; the fact that some of the violations here occurred notwithstanding Lewis' written and oral undertakings with respect to the conduct of his business, and creation of a dangerous condition with potential long-term deleterious effects on the environment whose full implications on human and animal life may not be known for many years to come.
Punitive damages are generally not imposed unless there is some intentional wrongdoing of a particularly egregious nature committed by the actor. Fischer v. Johns Manville Corp., 103 N.J. 643, 654-655 (1986); Nappe v. Anschelewitz, Barr, Ansell and Bonello, supra, 97 N.J. at 48. Mere negligent conduct, even if characterized as "gross negligence," is insufficient to support a punitive damages award. Enright v. Lubow, 202 N.J. Super. 58, 75-76 (App.Div. 1985). Thus, by definition, the distinction between punitive damages and a statutory penalty makes it clear that intentional conduct is not required to support the imposition of civil penalties here.
*575 Moreover, long-standing principles of basic statutory construction support the imposition of penalties in this case. The penalty provisions of N.J.S.A. 13:1E-9f and N.J.S.A. 58:10A-10e state that penalties "shall" be imposed. The word "shall" is generally interpreted as being mandatory, and not merely directory, unless it is used to effectuate a provision relating to form and manner. Harvey v. Bd. of Chosen Freeholders of Essex County, 30 N.J. 381 (1959); Bell v. Western Empire Ins. Co., 173 N.J. Super. 60 (App.Div. 1980). The existence of a penalty section in a statute is generally strong evidence of the Legislature's intent to deter violations. State v. Koziol, supra, 157 N.J. Super. at 502-503. If the Legislature had intended that a trial judge have discretion in whether penalties should be imposed at all, it could easily have so provided. Department of Labor & Industry v. Rosen, supra, 44 N.J. Super. at 49. See also N.J.S.A. 13:1E-9d and g.
Consequently, we conclude that the trial judge mistakenly exercised his discretion in refusing to impose monetary penalties in this case against the defendants. We emphasize that the goals of the environmental laws at issue here are both remedial and preventative. They are designed to help deter individuals from polluting the environment, and must be read broadly with that goal in mind. K.S.B. Tech. Sales v. No. Jersey Dist. Water Supply Comm'n, 75 N.J. 272, 287 (1977); N.J. Bldrs. v. Dept. of Environmental Protec., 169 N.J. Super. 76, 85-86 (App.Div. 1979), certif. den. 81 N.J. 402 (1979). To conclude that penalties may only be imposed in the face of intentional conduct would severely restrict their application and greatly hamper the State's efforts to prevent the illegal dumping of toxic pollutants. Any potential inability of defendants to pay, and that has not factually been established (indeed Lewis did not even testify), is not the determinative factor in assessing penalties for the types of violations involved here. We recognize that the trial judge had authorized supplemental proceedings to allow the State to inquire into defendant's assets. Although that course was not pursued before the appeal was taken, plaintiffs *576 were not required to do so before they could challenge the judge's rulings.
The conduct of the defendants here has created significant risks which the environmental laws were intended to safeguard against. Hence, at the very least, penalties must be assessed in this case in an amount which would effectively strip defendants not only of profits made in connection with their illegal dumping of wastes, but also in a sufficient amount to deter others from polluting the environment. The penalty imposed must be large enough so as not to become the equivalent of a permit fee or a mere cost of doing business. It should be clearly understood that violators can neither profit by such actions nor escape responsibility for such acts, regardless of their financial condition, particularly in view of the strong legislative policy to deter the dumping of toxic wastes. This supports the Legislature's stated policy of deterring pollution of the environment. While there may be a case in which the facts support suspending the imposition of statutory penalties, we conclude that this is clearly not warranted here.
Similar reasoning also compels us to reverse the trial judge's refusal to order defendant to finance a ground water study. See also N.J.S.A. 13:1E-41 (requiring installation of monitoring wells and frequent sampling thereof). Provisions in both the Water Pollution Control Act, N.J.S.A. 58:10A-10c(3) and (4), and the Solid Waste Management Act, N.J.S.A. 13:1E-9b(2) and (3)[6] allow the State to seek an assessment of costs against polluters for the investigation of violations and their subsequent correction. Our Supreme Court has also specifically recognized that those who pollute the land must pay for its cure regardless of whether or not their acts were intentional. *577 State, Dept. of Environmental Protection v. Ventron, 94 N.J. 473, 493 (1983).
The State produced evidence as to the need for further study of the pollution problem on Lewis' land which would entail the drilling of more monitoring wells and the taking of more extensive water tests. Affidavits submitted to the court in connection with the motion for reconsideration indicated that the total cost of a modest, but effective study would be approximately $44,000. Although in the instant case the State clearly established, and the Chancery Judge found, that defendants had dumped excessive amounts of waste onto the property, far in excess of what the land could naturally handle and absorb, the judge declined to order defendants to pay for monitoring wells or pollution studies. This ruling was made despite his finding that dumping on the property had affected the adjacent wetlands and polluted the Cohansey Aquifer which was under the property.
In refusing to require defendants to finance such a study, the trial judge concluded that the need for one had not been established, that such studies usually involved "astronomical costs" and, without any hearing on defendant's finances, that defendant was simply unable to afford such an expenditure. The record does not support these conclusions. The costs for the proposed well monitoring and studies were not astronomical, particularly considering the nature of the environmental harm and potential implications for future harm. In addition, Lewis, directly or indirectly owned or had rights to property, including the land (valued in excess of $100,000) and the equipment used in the business, all of which presumably had value which could be converted into funds to correct the environmental harm done. All defendants' assets and potential assets may be taken into account. Likewise equipment used by the defendants in such violations is subject to forfeiture. While we do not imply that the individual defendant here must be stripped of all his assets or that he must bear the entire expense involved, we note that the taxpayers should not be saddled with sole responsibility *578 for expenses caused by defendants. Defendants may be required to share in the expenses with the State if the financial situation warrants.
We thus conclude that the trial judge abused his discretion in this regard. The sole question here is the need for the study. The State established the need by showing that defendant's activities had resulted in pollution of the environment. The necessity of determining the extent of the pollution and the best possible remedy to be used, if one is needed, requires that a study be done. We interpret the legislative intent behind the environmental laws as a command that those who pollute the environment be required to finance studies to determine the environmental effects of their conduct.
Those portions of the order appealed from are reversed. The matter is remanded to the trial court for a plenary hearing with respect to imposition of statutory penalties, and the assessment of penalties (which should average a meaningful amount for each day of violation or day on which the violation continued), and for entry of an order requiring defendant to finance the cost of monitoring wells and of a ground water study, consistent with this opinion.
NOTES
[1] In this opinion reference to defendant refers to John Lewis unless otherwise indicated. The term defendants generally refers to defendants other than Timothy Lewis and Estate of Robertson unless otherwise stated.
[2] GSSES had its Certificate of Incorporation voided for the nonpayment of State taxes on November 17, 1983.
[3] OSSS is a Delaware corporation. The Certificate authorizing it to do business in New Jersey was revoked on October 4, 1984 for failure to pay State taxes.
[4] We likewise reject those contentions as without merit. R. 2:11-3(e)(1)(A) and (E).
[5] At the time of the filing of the complaint, these provisions were codified in subsection c of the cited statute. L. 1985, c. 483 redesignated former subsection c as subsection f, effective January 17, 1986.
[6] At the time of the filing of the complaint these provisions were codified in subsection b of the cited statute. L. 1985, c. 483 redesignated subsection b as current subsection d, effective January 17, 1986.