718 A.2d 727 (1998)
315 N.J. Super. 397
MIDDLESEX COUNTY DEPARTMENT OF HEALTH, Plaintiff,
v.
William IMPORTICO (Amended to Importico's, Inc.), Defendant.
Superior Court of New Jersey, Law Division, Middlesex County.
Decided August 17, 1998.
As Amended June 29, 1998.
*730 Neil H. Flaster, for plaintiff (Weiner Lesniak, Parsippany).
Marc J. Friedman, for defendant (Rich & Friedman, Parsippany). *728
*729 CORODEMUS, J.S.C.
This court is asked to decide whether defendant Importico's Inc. violated the Solid Waste Management Act, N.J.S.A. 13:1E-1, to 13:1E-207 and the regulations promulgated under the statute, N.J.A.C. 7:26-6.5(m) and 7:26-2.13(c)(2). Plaintiff Middlesex County Department of Health (hereinafter "MCHD") appeals from the ruling of the Honorable Herbert C. Kaplan, J.M.C. of the Municipal Court of the Township of East Brunswick, which dismissed the civil penalty action against the defendant.
I. Historical, Factual and Legal Background
In 1970, New Jersey's Legislature passed the Solid Waste Management Act (the Act). The purpose of the Act was to establish "a framework for the coordination of solid waste collection, disposal, and utilization activity in New Jersey." A.A. Mastrangelo, Inc. v. Commissioner of Dep't of Envtl. Protection, 90 N.J. 666, 672, 449 A.2d 516 (1982). Additionally, the Act attempted to "regulate the rates at which ... these services [would be] ... provided as a means of providing safe, adequate and proper waste management services." Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders, 48 F. 3d 701, 705 (3d Cir.1995) (hereinafter "Atlantic Coast I") (citations omitted).
Management of New Jersey's solid waste system is delegated to twenty-two solid waste management districts. Id. Each district is managed either by the county government or by a municipal authority created for this purpose. Id. The districts are also responsible for developing a solid waste management plan. A.A. Mastrangelo, Inc., supra, 90 N.J. at 673, 449 A.2d 516. After adoption of a plan by the district, the district submits it to the Commissioner for the Department of Environmental Protection and Energy. Id. The Commissioner either approves, modifies, or rejects the plan. Id.
N.J.A.C. 7:26-6.5(m) requires that solid waste consisting of types 10, 13, 23, 25 and 27 "generated from within all municipalities in Middlesex County shall be disposed of at the Middlesex County Utilities Authority Landfill (Edgeboro) ... located in East Brunswick, Middlesex County, New Jersey." Pursuant to the Solid Waste Management Act and N.J.A.C. 7:26-6.5(m), the Board of Chosen Freeholders of Middlesex County adopted its Solid Waste Management District Plan Amendment on September 13, 1987. (hereinafter "District Plan"). The District Plan prohibited solid waste from outside of the District from being delivered to and accepted by the Edgeboro Landfill in East Brunswick, New Jersey. The DEP approved the District Plan by Order dated November 20,1987.
When solid waste is brought to the Edgeboro Landfill, the truck driver provides the operator at the scale house with an Origin/Disposal (hereinafter "O & D") form. An O & D form provides information which was recorded by the hauler in its daily record. N.J.A.C. 7:26-2.13(c). This information includes the cubic yard, tonnage or gallon capacity of the solid waste vehicle or container, the types of solid waste, and the place of origin of the waste, among other things. N.J.A.C. 7:26-2.13(a)(3), (4), and (6). Based upon the O & D form, an invoice is produced identifying the source and type of solid waste which was delivered to the Edgeboro Landfill. To prevent out-of-district waste from entering the Landfill, Middlesex County Utilities Authority (hereinafter "MCUA") employees perform inspections of the waste loads that are brought to the Landfill. Typically, an inspection consists of a visual examination of the top, front, back and two sides of the load after it is physically dropped off at the Landfill. A hauler violates the District Plan if an inspector finds that there is a minimum of twenty percent of out-of-district waste in the load.
Importico's Inc. is a licensed solid waste hauler and transfer station operator in Middlesex County. Importico's does business primarily in Hunterdon, Mercer, Middlesex, Union and Somerset Counties. As part of its *731 business Importico's collects and transfers containers from customer's sites to its transfer station. The transfer station is licensed to only accept refuse that its trucks collected from its customers. When waste is brought to the transfer station, it is dumped onto a tipping floor and recyclable material is removed. This waste is often mixed with waste from other counties. The residual waste is then reloaded and transported to a designated disposal site, such as the Edgeboro Landfill.
Between September 8, 1988 and January 11, 1994, MCUA inspectors performed several inspections of solid waste that Importico's had transported to the Edgeboro Landfill. Based upon these inspections, MCHD alleges that Importico's committed nine separate violations of New Jersey's waste flow regulations and the District Plan.[1] It charged Importico's with transporting solid waste from other counties to the Edgeboro Landfill in violation of N.J.A.C. 7:26-6.5(m) and with falsifying O & D waste disposal forms in violation of N.J.A.C. 7:26-2.13(c)(2).[2] Based upon these alleged violations, MCHD assessed penalties totaling $195,200.
MCHD brought a civil action against Importico's in the East Brunswick Municipal Court to recover the penalties.[3] During the trial below, Judge Kaplan heard testimony from a number of witnesses and accepted a large volume of evidence. Although Judge Kaplan found that MCHD proved a prima facie case that Importico's violated Middlesex County's dumping policy, he determined that Importico's was in substantial compliance with the regulations and dismissed the plaintiff's case.[4] As a result of Judge Kaplan's decision, MCHD filed an appeal de novo with this court.
On appeal, a Superior Court is required to hear a trial de novo on the record. R. 3:23-8(a). The court's function " `is to determine the case completely anew on the record made in the Municipal Court, giving due, although not necessarily controlling, regard to the opportunity of the magistrate to judge the credibility of the witness[es].' " New Jersey v. Avena, 281 N.J.Super. 327, 333, 657 A.2d 883 (App.Div.1995) (quoting State v.Johnson, 42 N.J. 146, 157, 199 A.2d 809 (1964)). Additionally, the Superior Court judge must make his or her own findings of fact. Id. (citations omitted). As will be discussed, this court finds that Importico's falsified O & D forms when it brought waste from outside the District to the Edgeboro Landfill, without transporting the waste to its transfer station, and identified the origin of the waste as being from within the District.
II. Jurisdiction of Court to Hear De Novo Appeal
Importico's, Inc. contends that this court does not have jurisdiction to hear this appeal de novo because the court rules do not authorize such action. In retort, MCHD argues that the combination of R. 4:74-2, 4:74-3, 4:74-5 and 7:9 provide an adequate basis for this court's jurisdiction. This court finds that it does have jurisdiction over this matter.
N.J.S.A. 13:1E-9(f) provides that "[a]ny person who violates the provisions of P.L. 1970 c. 39, or any code, rule or regulation *732 adopted pursuant thereto shall be liable to a penalty of not more than $50,000 per day, to be collected in a civil action commenced by... a county health department...." The statute also states that Superior Courts and municipal courts have concurrent jurisdiction "to enforce the provisions of the `penalty enforcement law' [ (N.J.S.A. 2A:58-1 et seq.) ] in connection with this act." Id. Upon judgment in a civil action, a party may appeal the decision of the municipal court in accordance with R. 4:74-3. R. 4:74-5. R. 4:74-3 provides that a party shall appeal to the Law Division of the Superior Court in the county of venue. See R. 4:74-3 (stating that party appealing municipal court judgment shall file notice of appeal with municipal court clerk stating that appeal is being taken to Law Division, Superior Court).
Here, MCHD commenced a civil action in municipal court to collect penalties pursuant to the Solid Waste Management Act against Importico's. Because Judge Kaplan rendered a judgment against it, MCHD has a right to appeal to the Law Division, Superior Court. Therefore, this court has jurisdiction to hear this appeal.
III. Applicability of Double Jeopardy Clause
Importico's also argues that this action should be dismissed because it violates the Double Jeopardy Clause of the United States Constitution. The Double Jeopardy Clause provides that no "person [shall] be subject to the same offence to be twice put in jeopardy of life or limb." Based upon this clause and United States v. Halper, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), Importico's contends that its successful defense of the action in municipal court prohibits MCHD from bringing an appeal in Superior Court.
Recently, however, the United States Supreme Court reviewed the Double Jeopardy Clause and "disavow[ed] the method of analysis used in ... Halper.'" Hudson v. United States, 522 U.S. 93, ____, 118 S.Ct. 488, 491, 139 L.Ed.2d 450 (1997). In Hudson, the Court reaffirmed the two-part test that was explained in United States v. Ward, 448 U.S. 242, 248-49, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). Hudson, supra, 522 U.S. at ___, 118 S.Ct. at 491. The test requires that a court first determine whether the legislature, "in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." Id. at ___, 118 S.Ct. at 493 (quoting, Ward, supra, 448 U.S. at 248, 100 S.Ct. 2636). If a court concludes that the legislature intended the proceedings to be civil, the court must still consider "whether the statutory scheme was so punitive either in purpose or effect ... as to `transfor[m] what was clearly intended as a civil remedy into a criminal penalty.' " Id. (citations omitted). In ascertaining whether an intended civil remedy is actually a criminal penalty, the Court listed several factors which could be "useful guideposts." Id. These factors included:
(1) "[w]hether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of scienter"; (4) "whether its operation will promote the traditional aims of punishment-retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned."
[Id. (quoting Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963))].
Here, the Solid Waste Management Act's language expressly establishes that the Legislature intended the statute's enforcement mechanisms and penalties to be civil in nature. As stated prior, N.J.S.A. 13:1E-9(f) provides that a county health department may bring a civil action for alleged violations of the Act for solid waste. Id. (emphasis added). In comparison, N.J.S.A 13:1E-9(g) states that a person who violates its provisions in regards to hazardous waste "shall, upon conviction, be guilty of a crime of the third degree...." Id. In creating penalties for violations of the Solid Waste *733 Management Act, the Legislature made specific distinctions between actions that required criminal and civil sanctions. This difference indicates that the Legislature considered the penalties in N.J.S.A. 13:1E-9(f) to be civil.
Additionally, contemporaneous construction of the Solid Waste Management Act provides support that the Legislature intended the Act's enforcement mechanisms and penalties for solid waste violations to be civil. See National Waste Recycling, Inc. v. MCIA, 150 N.J. 209, 224, 695 A.2d 1381 (1997) (" `Courts may ... freely refer to legislative history and contemporaneous construction for whatever aid they may furnish in ascertaining the true intent of the legislation.' ") (citation omitted). In his Reconsideration and Recommendation Statement for Assembly Bill No. 881L.1987, c. 158, Governor Kean stated that "[u]nder the Act, only violations involving hazardous waste may be the subject of criminal actions. Violations involving `solid waste' as that phrase is commonly used would be subject to ... civil penalties through the filing of a civil action by ... a county health department." N.J.S.A. 13:1E-9(f), Governor's Reconsideration and Recommendation Statement. (emphasis added).
Moreover, the penalties provided for in the Act are not criminal under the Kennedy factors. For example, the penalties "are not excessive in relation to the funds expended by the state for the investigation and prosecution of violators" of the Solid Waste Management Act. See In re Recycling & Salvage Corp., 246 N.J.Super. 79, 107, 586 A.2d 1300 (App.Div.1991) (noting that courts have upheld penalties which related to investigation and enforcement). Thus, the enforcement mechanism provided in the Solid Waste Management Act for solid waste violations is civil in nature, and Importico's Double Jeopardy argument fails.
IV. Retroactivity of Atlantic Coast II
On May 1, 1997, the Third Circuit declared that New Jersey's waste flow control laws violated the dormant commerce clause of the United States Constitution. Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders, 112 F. 3d 652 (3d Cir.), cert. denied sub nom., Essex County Utils. Auth. v. Atlantic Coast Demolition & Recycling, Inc., ___ U.S. ____, 118 S.Ct. 412, 139 L.Ed.2d 316 (1997) (hereinafter Atlantic Coast II). In Atlantic Coast II, the court examined this State's waste flow control laws which required "waste management districts to contract with designated waste facilities for the disposal of locally generated waste."[5]Id. at 655. Specifically, the court inquired whether the imposition of tipping fees, which are charged by the disposal facilities for the disposing of waste, were violative of the dormant commerce clause. Id. at 658.
The County Authorities and State argued that the waste flow control laws and tipping fees were necessary to prevent illegal dumping and finance the cost of paying the debt of the waste disposal facilities. Id. at 664-65. Applying the heightened scrutiny test, the Third Circuit determined that New Jersey did not satisfy its burden that it lacked alternative nondiscriminatory means of financing the State's waste disposal system.[6]Id. at 665-67. The court enumerated several possible alternatives, including: (1) issuing new bonds to refinance the waste disposal facilities, (2) implementing "user charges" or a "systems benefit charge" to create revenue and (3) enacting a general tax which could fund the debt of the local waste facilities. Id. at 666. Thus, it held that New Jersey could not "protect the local waste disposal market, and thereby exclude out-of-state competitors, in order to use inflated revenues to finance the substantial debts of its waste management districts." Id. at 667.
Even though the Atlantic Coast II court determined that New Jersey's waste flow laws are unconstitutional, this court is not bound by its decision. In Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 577 A.2d *734 1239 (1990), the New Jersey Supreme Court observed that lower federal courts and state courts occupy the same position in the national judicial structure. Id. at 79, 577 A.2d 1239. The Court reiterated its position that " `[d]ecisions of a lower federal court are no more binding on a state court than they are on a federal court not beneath it in the judicial hierarchy.' " Id. (citations omitted). Despite this assertion by the Court, it acknowledged that state courts should recognize judicial comity. See id. (noting that judicial comity helps ensure uniformity and discourage forum shopping). Here, this court believes that judicial comity is appropriate and declines to relitigate the issue whether New Jersey's waste flow laws are unconstitutional. This court accepts the Atlantic Coast II court's decision that New Jersey's waste flow control laws are unconstitutional, because the State does not lack alternative nondiscriminatory means of achieving its interests in preventing illegal dumping and financing the State's waste disposal facilities.
Despite this court's acceptance of the Third Circuit's decision that New Jersey's waste flow laws violate the United States Constitution, there remains the issue whether Atlantic Coast II should be applied retroactively. Although the Third Circuit discussed the United State Supreme Court's most recent pronouncements on the retroactivity of federal question decisions, it did not explicitly state whether its decision should be given retroactive effect. See id. at 672 (noting current Supreme Court retroactivity jurisprudence and deciding not to discuss whether opinion is retroactive). Recently, however, the Appellate Division in In re Allegations of Violations of Law and Administrative Code by A. Fiore & Sons, Inc., (hereinafter "Fiore"), 305 N.J.Super. 192, 701 A.2d 1303 (App.Div.1997), determined that Atlantic Coast II should be applied retroactively by the courts. Id. at 204-06, 701 A.2d 1303.
In Fiore, the court examined the United States Supreme Court's most recent opinions of Reynoldsville Casket Co. v. Hyde, 514 U.S. 749, 115 S.Ct. 1745, 131 L.Ed.2d 820 (1995) and Harper v. Virginia Dep't of Taxation, 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993). It observed that these cases "clearly point to retroactive application." Fiore, supra, 305 N.J.Super. at 204, 701 A.2d 1303. The court rejected the State's arguments that it should rely on unpublished Appellate Division decisions, Walker v. Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967), and In re Felmeister, 95 N.J. 431, 471 A.2d 775 (1984), because it determined that Reynoldsville and Harper were "more recent and directly applicable statements of the United States Supreme Court." Id. at 205, 701 A.2d 1303. Like the State in Fiore, MCHD argues that this court should follow unpublished state court opinions, Walker and Felmeister.[7] As will be discussed infra, this court believes that Fiore was properly decided and holds that Atlantic Coast II should be given retroactive effect.
*735 The United States Supreme Court's most recent articulations on retroactivity, as the Fiore court observed, are Harper and Reynoldsville. In Harper, the United States Supreme Court stated that the "application of a rule of federal law to the parties before [it] requires every court give retroactive effect to that decision." Harper, supra, 509 U.S. at 90, 113 S.Ct. 2510. This effect extends to "all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." Id. at 97, 113 S.Ct. 2510.
MCHD's reliance on Walker and Felmeister is misplaced. The Appellate Division in Fiore noted that "Walker and Felmeister were ... responses of the courts to direct challenges to judicial power." Fiore, supra, 305 N.J.Super. at 205, 701 A.2d 1303. An examination of Walker and Felmeister reveals that the Fiore court correctly evaluated these cases. In Walker, Birmingham officials obtained an injunction prohibiting civil right protesters from parading without a permit. Walker, supra, 388 U.S. at 308, 87 S.Ct. 1824. The protesters, however, disobeyed the injunction Id. They were subsequently charged with violating the injunction and were fined and sentenced to jail. Id. at 311-12, 87 S.Ct. 1824. Despite the potential illegality of the injunction, the United States Supreme Court upheld the protesters' convictions because the protesters "were [not] constitutionally free to ignore all the procedures of the law and carry their battle to the streets...." Id. at 321, 87 S.Ct. 1824. The Court refused to overturn the marchers' punishments because they violated a court order. Thus, the Court's underlying concern in Walker was the protesters' lack of respect for the judicial process.
In Felmeister, the New Jersey Supreme Court had similar concerns for the lack of respect for the judicial process. In the case, two attorneys intentionally defied a ban on broadcast advertising. Felmeister, supra, 95 N.J. at 432, 471 A.2d 775. Broadcast advertising had been banned by a disciplinary rule. Id. The Court observed that the primary question in the case was "the Court's responsibility and authority to assure that its rules of conduct for attorneys are obeyed by all even while they are under challenge." Id. at 442, 471 A.2d 775. It believed that if attorneys were to disregard a Rule while it was being reviewed, there would be "chaos ." Id. The Court analogized the attorney's violation of the ban on advertising with those "who violate a court order and then seek to raise the unconstitutionality of the injunction as a defense to prosecution for the violation." Id. at 445, 471 A.2d 775. Thus, the New Jersey Supreme Court was not necessarily concerned with whether the Rule was unconstitutional but whether the attorneys intentionally violated a court order and disregarded the judicial process. See id. at 445-46, 471 A.2d 775 (observing that " `in the fair administration of justice no man can be judge in his own case, however exalted his station' ") (citation omitted).
Here, this case is not only factually but also theoretically distinguishable from both Walker and Felmeister. Importico's did not violate any court order or rule. Its actions were not in disrespect of the judicial process. Additionally, there is no evidence that Importico's acted to intentionally challenge Middlesex County's District Plan because it believed that New Jersey's waste flow regulations or the District Plan were unconstitutional. Although Mary Capone, Importico's' Operation Manager, testified that she did not believe that Importico's was required to follow the District Plan, her opinion was based upon instructions given to her by the DEP.[8] The *736 mere fact that Importico's challenged the constitutionality of New Jersey's waste flow laws before this court does not prevent Atlantic Coast II from being applied retroactively. Thus, based upon the above, this court shall apply the Atlantic Coast II decision retroactively, and MCHD's claims of alleged violations of the waste flow laws under N.J.A.C. 7:26-6.5(m) by Importico's are dismissed.[9]
V. Falsification of the Origin and Destination Forms
Although the Third Circuit in Atlantic Coast II declared New Jersey's waste flow regulations unconstitutional, it was careful to explain that the State and counties were "free to regulate the flow of waste within New Jersey so long as the State's laws and regulations treat in-state and out-of-state facilities equally." Atlantic Coast II, supra, 112 F. 3d at 669. MCHD alleges that Importico's violated N.J.A.C. 7:26-2.13(c)(2) when it falsified O & D forms by naming Middlesex County as the place of origin, even though waste emanated from other counties. In its defense, Importico's argues that its actions were protected by the like-kind exchange of solid waste permitted in the DEP's "Pereira memo."
In 1983, the New Jersey Department of Environmental Protection (now, Department of Environmental Protection and Energy (DEPE)) issued a document known as the "Pereira memo." The memo stated:
Policy concerning solid waste flow direction is contained in the Interdistrict and Intradistrict Solid Waste Flow Rules.... These rules designate specific solid waste disposal facilities to service waste streams originating from specific geographic areas (usually a municipality). While transfer stations are not included in these Waste Flow Rules, they may accept solid waste from various origins as long as the solid wastes, or a similar amount of type, are ultimately transported for disposal [to] the facility designated in the Rules to service the geographic area.... Under no circumstances is a transfer station considered as the origin of the solid wastes leaving it. For purposes of determining where solid wastes shall be disposed of, the origin of the waste always remains the location where the waste was originally picked up before delivery to the transfer station.

[Passaic County Utilities Auth. v. DiBella Sanitation Service, Inc., 272 N.J.Super. 238, 240, 639 A.2d 745 (App. Div.1994) ].
In DiBella, the defendant waste collectors allegedly violated the Solid Waste Management District Plan for Passaic County by transporting waste out of Passaic County. Id. The Appellate Division agreed with the trial court "that principles of equitable estoppel and fundamental fairness should foreclose the imposition of penalties for actions taken in reliance on and in conformity with the Pereira memo, even if the issuance of that memo was substantively or procedurally flawed." Id. at 242, 639 A.2d 745. It observed that it would be inequitable for a county organization to impose penalties on solid waste haulers when the DEPE expressly authorized such action. Id.
Here, MCHD argues that Importico's should not be allowed to rely on the memo because the District Plan was approved by the DEPE after the memo was issued. Because the District Plan was approved after the memo was released, MCHD contends that the District Plan superseded the memo. Importico's could not rely on the memo because it either knew or should have known that it was subject to civil penalties for violating the District Plan.
*737 Despite the above arguments by MCHD, Importico's should be allowed to prove that it adequately relied on the Pereira memo. As observed by the DiBella court, county agencies and departments operate "under DEPE aegis in a statutory scheme designed for the " `coordination' ", of solid waste activity." Id. at 242, 639 A.2d 745. Importico should not be punished because the DEPE and Middlesex County could not coordinate their schemes for the disposal of solid waste in a non-conflicting manner. See id. ("If the responsible public agencies cannot coordinate their efforts, the haulers should not suffer the consequences."). Importico's may argue that its actions were within the like-kind exchange policy for solid waste provided by the Pereira memo.
Even when a court determines that a defendant may rely on the Pereira memo, however, the defendant still has the burden of proving that it actually relied on and was in conformity with the memo's requirements. To establish the above, a hauler must prove "to the factfinder's satisfaction that the delivery was to a properly licensed transfer station that itself was subject to the memo's requirement that it return, the solid wastes, or a similar amount and type, ... for disposal to the facility designated in the Rules [to] service the geographic area." Id. at 245, 639 A.2d 745. Additionally, as here, "if ... the hauler is also the operator of the transfer station, the hauler/operator must also assume the burden of proving that the residue-return requirements of the Pereira memo have been satisfied." Id.
MCHD contends that on three occasions Importico's transported solid waste to the Edgeboro Landfill without being processed through its transfer station. Because Importico's brought the waste directly to the Edgeboro Landfill, MCHD argues that Importico's cannot protect itself under the Pereira memo's like-kind exchange policy because the Pereira memo is limited to solid waste that was processed through a transfer station.
The plain language of the memo supports MCHD's position. The memo provides that a transfer station may accept solid waste from other places of origin. Additionally, the memo states that the transfer station is not considered the place of origin of the waste. Because the express language of the memo limited its application to transfer stations, Importico's may not rely on the memo for the alleged falsifications of the O & D forms when it did not transport waste to its transfer station before delivering it to the Edgeboro Landfill.[10]
A. Solid Waste Transported to Transfer Station
Under the Pereira memo, Importico's was allowed to bring non-Middlesex County waste to the Edgeboro Landfill if it returned an equivalent amount of waste to the county of origin. The parties, however, are in disagreement over whether Importico's satisfied the memo's and the O and D form's origin disclosure information. MCHD contends that Importico's falsified its certified O & D forms when it did not identify that the waste's place of origin was outside of Middlesex County. Even though the Pereira memo allowed like-kind transfers of solid waste, MCHD argues that the memo did not permit a hauler to omit the actual source of the waste on the O & D forms. MCHD stated in its brief that "[h]ad it been the intention of the State legislature or the DEP to include the source of the residual waste rather than the actual place of origin of the waste on the O & D forms.... it is reasonable to assume that the Pereira memo or the waste flow regulatory codification would have provided for such an interpretation."
In response, Importico's argues that the origin of waste information on an O & D form is the municipality for which the waste represents an equivalent amount. Additionally, it argues that if it had followed MCHD's interpretation, the Edgeboro Landfill would not have accepted the waste. In support of its claims, Importico's cites the testimony of Dennis Malinowski, who was in charge of the solid waste enforcement effort in Middlesex *738 County. While testifying, Mr. Malinowski stated that Middlesex County did not accept the DEP's policy in the Pereira memo, and that had a hauler identified waste on the O & D form as that from another county, the Edgeboro Landfill would not have accepted the waste.
The Pereira memo does not expressly identify what types of records must be kept by a hauler of solid waste. N.J.A.C. 7:26-2.13, however, does require that a hauler keep a daily record of wastes received. This information is supplied by the solid waste transporter on an O & D form. Id. (c). Among the items that a hauler must record on an O & D form is the place of origin of the waste, which includes identifying the municipality, county and State. Id. (a)(6). The Pereira memo stated that the origin of waste "always remains the location where the waste was originally picked up before delivery to the transfer station."
It seems incompatible that the DEPE would allow like-kind transfers of garbage but require the hauler to identify the specific county from which the waste was actually picked up. Reading the Pereira memo with N.J.A.C. 7:26-2.13(c)(2), this court believes that a hauler could provide the location of the residual waste on the O & D form as the origin of the waste.
Allowing a hauler to provide the source of the residual waste is a proper means of accomplishing the memo's like-kind scheme for the disposal of solid waste and produce the necessary origin information on the O & D forms. This court's decision is supported by comments made during the memo's codification process.[11] In response to a question concerning the commingling of different counties' solid waste, the DEPE stated that:
[n]either this rule nor the mixed policy that has been in place since 1983 requires transfer stations ... to establish separate tipping areas for each district serviced. The Department recognizes that keeping loads of waste from different counties separate at a transfer station ... is not practical. Therefore, this rule, like the policy it codifies, requires stringent recordkeeping but allows an equal amount and type of waste to be sent back to the generating county.
[25 N.J.R. 4766].[12] It is impracticable to allow a hauler to commingle waste from different counties on the tipping floor and then expect it to identify the actual source of the waste on its daily records and O & D forms. This court's decision, however, does not mean that a hauler may disregard this State's waste flow laws and regulations. As stated above in the codification comment, the *739 integrity of the waste flow rules are still protected by the stringent record keeping requirements of N.J.A.C. 7:26-2.13.
Here, Importico's has satisfied the stringent record keeping requirements of N.J.A.C. 7:26-2.13. Pursuant to N.J.A.C. 7:26-2.13(a)(8), a transfer station operator, such as Importico's, was required to keep a record of: (1) tonnages received by the municipality, (2) tonnages returned to the county of origin, (3) tonnages of recyclables taken out of the county and municipality and (4) tonnages an destinations of the recyclables shipped out.
During the municipal trial, Mary Capone testified that she was in charge of the record keeping for Importico's. She explained that as trucks entered Importico's transfer station, she would record the time of the truck's arrival, the municipality and county of origin for the waste and the amount of cubic yards of waste. Ms. Capone also testified that the driver would provide her with an O & D form.
Additionally, Ms. Capone explained the procedure for calculating and recording the amount of residual waste that was brought to a waste disposal facility. She testified that recyclables would be removed from a load after the waste was dumped onto the tipping floor at the transfer station. A visual inspection was then performed, and an estimation of the residual waste was made. Ms. Capone stated that the estimated yardage of waste was then converted into tons using a standard conversion factor. This information was recorded in Importico's daily record.
During his lengthy testimony, William Importico testified about whether Importico's brought the appropriate amounts of waste to the different waste disposal facilities. In support of his testimony, Mr. Importico produced various documents, including scale tickets, daily logs used to prepare monthly reports, and cancelled checks for payments made to the various waste disposal facilities.
Based upon the above, Importico's followed the recording requirements of N.J.A.C. 7:26-2.13. Importico's adequately reported the amounts of residual waste that were being returned to the appropriate waste disposal facilities. MCHD did not provide any evidence that Importico's incorrectly calculated the amount of the waste that was brought into its transfer station and the residual waste which was delivered to the Edgeboro Landfill. Therefore, Importico's substantially complied with the requirements of the Pereira memo, and this court dismisses MCHD's claims that Importico's falsified its O & D forms on the dates when Importico's transported waste to its transfer station.
B. Solid Waste Transported Directly to Edgeboro Landfill
MCHD claims that on three occasions, September 13, 1988, December 19, 1990 and January 11, 1994, Importico's transported waste to the Edgeboro Landfill without bringing it to its transfer station. Additionally, on these three days, MCHD alleges that Importico's falsified its O & D forms by naming Middlesex County as the place of origin of the waste. During the municipal court trial, Thomas Roberts, an inspector for the MCUA, testified that on September 13, 1998, he inspected a load of waste from Importico's. During his inspection, he not only uncovered evidence of out-of-county waste from Plainfield, North Plainfield and Watchung but also determined that Importico's had falsified its O & D form. Mr. Roberts also testified that Importico's truck driver told him that the waste did not come through the transfer station.
Another witness, Bernard Sadowski, a field inspector for the MCUA, testified that on January 11, 1994, he inspected a load of waste from Importico's and found that the waste came from out-of-district municipalities, including Greenbrook, Plainfield and Scotch Plains. Additionally, he determined that the load was not brought to the transfer station because there was no transfer station identification number affixed to the O & D form. Mr. Sadowski testified that Importico's listed Piscataway as the place of origin of the waste on the O & D form.
During the various searches, the Edgeboro Landfill inspectors took samples of the waste which they believed showed that Importico's violated the District Plan and waste flow regulations. In its defense, Importico's argues *740 that the procedures used by MCUA and MCHD to mark and store the evidence were inadequate and did not establish a proper chain of custody for the admission of the evidence.[13] Among its complaints about MCHD's handling of the evidence is that the confiscated items were never marked or placed in sealed envelopes, they were stored on a couch with evidence from other cases, and they were not catalogued by Landfill officials. Additionally, Importico's argues that a chain of custody is lacking because records were not kept of whom accessed the envelopes or whom made the xerox copies of the evidence that were admitted. Because a proper chain of custody was not kept by MCHD, Importico's contends that the evidence was highly susceptible to tampering.[14]
New Jersey Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter is what its proponent claims." Id.[15] Pursuant to Rule 901, "[a] party introducing tangible evidence has the burden of laying a proper foundation for its admission." State v. Brunson, 132 N.J. 377, 393, 625 A.2d 1085 (1993). As explained by the court in United States v. Mendel, 746 F.2d 155 (2nd Cir. 1984), cert. denied, 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985), "[e]stablishing a chain of custody is one form of proof sufficient to support a finding that the matter in question is what its proponent claims." Id. at 166; see also Brunson, supra, 132 N.J. at 393, 625 A.2d 1085 (noting that proper foundation for tangible evidence should include showing of uninterrupted chain of possession).
This court has not found, and the parties have not provided, any New Jersey cases that discuss the rule for chain of custody in civil cases. The rule for chain of custody, however, has been explained in several criminal cases. In the criminal decisions of this state, a chain of custody is sufficient if there is a "reasonable probability that the evidence has not been changed in important respects ... or is in substantially the same condition as when the crime was committed." State v. Brown, 99 N.J.Super. 22, 28, 238 A.2d 482 (App.Div.), certif. denied, 51 N.J. 468, 242 A.2d 16 (1968). Reasonable probability does not require that MCHD provide an uninterrupted chain of possession or "negate every possibility of substitution or change in condition between the event and the time of trial...." Id. at 27, 238 A.2d 482. The above cited rule may be equally applied to civil matters.[16]
During the municipal trial, Edward Windas, an assistant superintendent for the MCUA, testified to the procedure he used in delivering the evidence collected by the inspectors against Importico's to the MCHD. He stated that when evidence was brought to him he would fill out a transmittal letter. At that time, he would also make photocopies of the evidence. These items, along with the actual evidence, an invoice, and the inspector's report, were then delivered to the MCHD by either him or another employee of the MCUA.
Another witness, Dennis Malinowski, testified about the chain of custody of the evidence *741 once it was brought to the MCHD. He stated that after evidence was received, he removed the photocopies of the evidence and photocopied the transmittal letter and Waste Inspection Report. The entire package was then placed in a box on his couch. When the box was full, he would send it to the Middlesex County Archives for storage.
During his testimony, Mr. Malinowski did admit that he was unaware of how many people had access to the evidence at the Archives. Additionally, he testified that it took Archives employees two or three days to find the boxes of evidence. Upon retrieving the boxes, Mr. Malinowski stated that the boxes remained in his office for three months before the trial. Finally, he testified that at least ten people worked in his direct area.
Here, MCHD admits that the chain of custody was not perfect. This court agrees with MCHD's admission but is still satisfied that MCHD did maintain a sufficient chain of custody for the violations on September 13, 1988 and January 11, 1994. During the municipal trial, MCHD and MCUA employees testified concerning the procedures used when waste was seized and then stored at the Middlesex County Archives for trial. Importico's has presented no evidence that any of the confiscated items were either exchanged with evidence of another action or tampered with by either MCUA or MCHD employees or third persons. This court finds with reasonable assurance that the evidence presented at trial was not materially altered and remained in substantially the same condition as when the inspectors first took it from the waste loads. Thus, MCHD has sufficiently established the chain of custody of the evidence for September 13, 1988 and January 11, 1994, and the evidence will not be excluded. Moreover, because the evidence establishes that Importico's transported out of county waste to the Edgeboro Landfill and did not properly record the origin of the waste on the O & D form, this court finds that Importico's violated the recording requirements of N.J.A.C. 7.26-2.13(c)(2).[17]
VI. Assessment of Penalties
Based upon the falsifications of the O & D forms on September 13, 1988 and January 11, 1994, MCHD imposed penalties totalling $47,125.[18] In support of these penalties, MCHD argues that they are necessary not only to strip Importico's of profits made in connection with the violations but also to deter Importico's and others from any future deviations from the Solid Waste Management Act and the regulations. Importico's, however, argues that the penalties sought by MCHD are excessive. It contends that there was no proof presented in the municipal court that Importico's benefitted from the violations or that Importico's conduct should be deterred, especially because the Pereira memo has been codified. Additionally, Importico's argues that under N.J.A.C. 7:26-5.5's matrix for imposing penalties, Importico's actions were neither intentional nor foreseeable, and any illegal conduct by it amounted only to a minor violation.
As stated prior, N.J.S.A. 13:1E-9(f) provides that any person who violates any code, regulation or rule adopted pursuant to the Solid Waste Management Act "shall be liable to a penalty of not more than $50,000.00 per day." This penalty is mandatory, and a judge does not have discretion whether to impose the sanction. See Department of Envtl. Protection v. Lewis, 215 N.J.Super. 564, 575, 522 A.2d 485 (App.Div. 1987) (noting that "shall" has been generally interpreted as being mandatory). The court also does not need to find that the defendant acted either willfully or intentionally before it imposes penalties. Id. at 573-74, 522 A.2d 485; Department of Envtl. Protection v. *742 Harris, 214 N.J.Super. 140, 147, 518 A.2d 743 (App.Div.1986).
While a judge cannot refuse to impose a penalty for violations of the Act, he or she does have discretion in the amount of the penalty. Lewis, supra, 215 N.J.Super. at 574, 522 A.2d 485. For penalty purposes, the court may take into account a defendant's absence of intent or mens rea as a mitigating factor. Id. Additionally, " `[t]he number of violations, their frequency, the precautions taken to prevent further mishaps and the circumstances under which the offenses occurred are all relevant factors in determining the penalty.' " Id. (quoting Department of Health v. Concrete Specialties, Inc., 112 N.J.Super. 407, 411, 271 A.2d 595 (App.Div. 1970)).
Because Judge Kaplan dismissed all of the claims against Importico's, he never determined whether the assessed penalties were either proper or excessive. This court retains jurisdiction to determine the appropriateness of the penalties and will hold a hearing regarding the appropriateness of the sanctions imposed by MCHD within thirty days of the filing of this opinion.
NOTES
[1] The violations allegedly occurred on September 8, 1988 (9:00 a.m. and 3:20 p.m. inspections), September 13, 1988, January 3, 1990, October 19, 1990, December 19, 1990, March 16, 1993, November 3, 1993 and January 11, 1994.
[2] N.J.A.C. 7:26-2.13(c)(2) provides that "[p]rior to discharge of the solid waste, the transporter shall complete the O and D form and sign it, thereby certifying the accuracy of the information provided...."
[3] MCHD originally filed its complaint in municipal court against William Importico, owner of Importico's, Inc., and Importico's, Inc. Upon discovery that Importico's was incorporated during the time of the alleged violations, MCHD withdrew its complaint against William Importico.
[4] During his decision, Judge Kaplan stated, "Plaintiff proved a prima facie case, based upon on health officer Melinowski's imposition of local dumping policy, which was apparently violated by defendant. I believe factually that defendant did what was charged." (Decision of Judge Kaplan, page 5:19-22). In refusing to impose sanctions, however, he observed, "I believe that Importico's employee, [Mary] Capone, kept adequate records of compliance, keeping in mind the subject matter. How in the world can anyone keep precise garbage records." Id. at 7:2-5.
[5] The Third Circuit examined New Jersey's Solid Waste Management Act and Solid Waste Utility Control Act, N.J.S.A. 48:13A-1 to 48:13A-13.
[6] Because the State and County Authorities did not cite to the record in support of their interest in preventing illegal dumping, the court limited its discussion to the imposition of tipping fees. Id. at 665.
[7] MCHD relied on the following unpublished decisions:

1. Department of Envtl. Protection v. Lennon, Appellate Division Docket No. A-000778-94T1, 1996 WL 777075, decided July 30, 1996 (holding that Atlantic Coast II did not effect imposition of penalties based upon Walker and Felmeister and because appellants deliberately ignored waste flow orders).
2. Union County Utils. Auth. v. Jersey Carting, Inc., Appellate Division, Docket No. A-5067-92T3, decided July 5, 1995 (determining that penalties would not be affected because rule of retroactivity is not absolute).
3. Passaic County Utils. Auth. v. Frank's Sanitation, Inc., Appellate Division, Docket No. A-2555-93T1, decided June 22, 1995 (noting that although Walker and Felmeister allowed enforcement after statute was declared unconstitutional, determined that it did not have to reach issue of retroactivity because appellants' constitutional claim was not raised in timely manner).
4. Pollution Control Fin. Auth. v. Carmen Forgione & Sons, Inc., Superior Court of New Jersey, Law Division, Warren County, Docket No. WRN-565-96, decided May 30, 1997 (relying on Lennon and holding that defendant could still be required to pay penalties even though waste flow regulations declared unconstitutional).
5. Morris County Utils. Auth v. Morris County Sanitation Serv., Superior Court of New Jersey, Law Division, Morris County, Docket No. MRS-L-3388-96, decided October 10, 1997 (determining that Atlantic Coast II should not apply retroactively because it is non-final decision).
[8] Ms. Capone's testimony is revealing that Importico's did not intentionally violate the District Plan because it believed that New Jersey's waste flow regulations and the District Plan were unconstitutional. At the municipal trial, she stated:

Q Is it your testimony that you did not know that Middlesex County Utility Authority did not accept out-of-county waste between 1988 and 1993?
A It is my understanding that they did not accept out-of-county waste as in, say I'm a hauler without a transfer station and I go to Somerset County and I pick up compactor behind a store and I drive directly to MCUA, no, that they did not accept. That, they would not accept....
Q So where do you get your information from?
A From the DEPE....
Q So you're contending you're not governed by the rules and regulations and you can do whatever you want with regard to delivering waste to the landfill?
A No. As long as I follow the rules set forth by the State of New Jersey, I'm in compliance.
[9] Although the Supreme Court in Harper and Reynoldsville limited its discussion to its own decisions, the Fiore court noted that " `there is no cogent basis for distinguishing decisions handed down by the inferior courts' when applying the Harper retroactivity rule." Fiore, supra, 305 N.J.Super. at 204, 701 A.2d 1303 (quoting Laborers' Int'l Union v. Foster Wheeler Corp., 26 F. 3d 375, 386 n. 8 (3d Cir.), cert. denied, 513 U.S. 946, 115 S.Ct. 357, 130 L.Ed.2d 311 (1994)). This court agrees with the Fiore court's observation.
[10] During her testimony, Mary Capone admitted that solid waste which was brought directly to the Landfill was not within the provisions of the Pereira memo.
[11] The Pereira memo was codified under N.J.A.C. 7:26-2B.9.
[12] In its brief, MCHD argues that the DEP did not allow the commingling of waste unless it was processed separately and disposed of at the facility specified in the waste flow rules. In support, MCHD cites a July 25, 1988 letter written by William J. Hoffman, Chief of the Bureau of Planning for the DEP. This court finds that the letter does not establish that Importico's was forbidden to commingle waste unless it was processed separately. The letter states, in pertinent part:

[T]he Department ... is in the process of developing a waste flow rule change which will prohibit the collection by haulers of mixed wastes loads. However, transfer stations may accept wastes destined for different disposal facilities if processed separately and disposed of at the facility specified in the waste flow rules for the originating municipality or county. For the purposes of your letter, you may consider this policy to be the Department's current position.
MCHD's argument that a "Separate Policy" by the DEP for solid waste existed is supported by references made in Fiore. See Fiore, supra, 305 N.J.Super. at 196, 701 A.2d 1303 (noting that DEP issued policy after Pereira memo which required haulers keep waste from each county separate in truck and at transfer station). The Fiore court, however, commented that "[a]t one point in the 1980's the Board of Public Utilities..., the DEP, and the Passaic County Utilities Authority had such conflicting regulations that it was impossible for ... [the defendant hauler] to comply with any one of them without violating another." Id. This matter appears to involve a similar conflict between the DEP's Pereira memo and "Separate Policy". MCHD has presented no evidence that the DEP's "Separate Policy" was disseminated to the public, thereby putting Importico's on notice, or that the Policy was even being enforced when Importico's allegedly violated the District Plan. The Hoffman letter was not written to the general public but to the originating letter's author. Thus, this court finds, based upon the record before it, that Importico's was allowed to commingle waste without processing it separately.
[13] Based upon the court's earlier rulings, the issue of chain of custody is limited to evidence seized on September 13, 1988, December 19, 1990 and January 11, 1994.
[14] Although not clear, Judge Kaplan determined that the MCHD did establish an adequate chain of custody. In his opinion, he stated:

On cross examination, defense raised the innuendo that the evidence may have been tampered with while in storage at County Archives, but there was no evidence of tampering. Sloppy handling at worst, with some items mislaid at the Archives vault. But as a whole, honest in their presentation, and so treated in evidence.
[Decision of Judge Kaplan, page 5:14-19].
[15] The New Jersey Rule generally follows Fed. R.Evid. 901. Richard J. Biunno, Current N.J. Rules of Evidence, 1991 Supreme Court Committee Comment to N.J.R.E. 901 (Gann).
[16] See, e.g., Crockett v. Schlingman, 741 S.W.2d 717 (Mo.Ct.App.1987) (stating that chain of custody is sufficient when there is reasonable assurance that object is same and in same condition); Storm v. Ford Motor Co., 526 S.W.2d 875 (Mo.Ct. App.1975) ("The chain of custody doctrine as a principle of proof relates equally to civil and criminal proceedings.").
[17] MCHD did not produce any physical evidence for the December 19, 1990 violation. Additionally, during his testimony, Thomas Roberts testified that he was unable to remember many of the facts and circumstances surrounding the alleged December 19, 1990 violation. Without physical proof that Importico's attempted to deliver out-of-district waste to the Edgeboro Landfill, this court is compelled to dismiss the claim relating to December 19, 1990.
[18] These penalties relate to penalty assessment number 21188 for September 13, 1988 ($7125.00) and penalty assessment number 005-94 for January 11, 1994 ($40,000.00).